In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-3664, 14-3725

OHIO NATIONAL LIFE ASSURANCE CORP.,

*Plaintiff-Appellee / Cross-Appellant*,

*v.*

DOUGLAS W. DAVIS, *et al.*,

*Defendants-Appellants*,

*and*

STEVEN EGBERT,

*Defendant / Cross-Appellee*.

On appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 2386 — **Thomas M. Durkin**, *Judge*.

ARGUED SEPTEMBER 16, 2015 — DECIDED OCTOBER 20, 2015

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. This diversity suit presents challenging issues of Illinois insurance law concerning what is called "stranger-originated life insurance" (STOLI, as the cognoscenti call it). The district court resolved the case at the

summary judgment stage in favor of the plaintiff, the insurance company Ohio National, awarding it damages of $726,000 (we round all figures to the nearest $1000) against all the defendants but Egbert, whom the court awarded the $91,000 that he had paid the company in premiums. The defendants (other than Egbert) have appealed the denial of their motion to vacate the summary judgment in favor of Ohio National, and Ohio National has appealed the award to Egbert.

A preliminary matter: The defendants claim to have been prejudiced by Ohio National's violation of Local Rule 56.2 of the Northern District of Illinois. The rule requires a party moving for summary judgment against a pro se litigant to inform his opponent of the procedures for complying with Fed. R. Civ. P. 56. *Timms v. Frank*, 953 F.2d 281, 285–86 (7th Cir. 1992). The defendants argue that the lack of notice prevented them from mounting an effective defense to Ohio National's motion for summary judgment. The district court disagreed, ruling that the defendants had not been prejudiced because they'd eventually been able to submit the evidence they thought necessary for an effective defense and that evidence had not altered the judge's belief that Ohio National was entitled to summary judgment. The judge's response was proper.

The facts are complicated (the briefs occupy 150 pages, and the district judge's commendably thorough two opinions occupy 50 pages). Defendant Mavash Morady, an insurance agent, contracted with Ohio National to sell life insurance policies issued by it. Defendant Douglas Davis, a lawyer formerly licensed in California, approached elderly persons and persuaded them to become the nominal (in a

sense to be explained) buyers of the policies, with Mavash Morady as the insurance agent. Davis promised to pay these persons small amounts of money for obtaining policies, and in exchange for the promises they filled out applications for life insurance. A typical such buyer was Charles M. Bonaparte, Sr. His application was accepted, the policy was issued to him, and the defendants had him place the policy in the Charles M. Bonaparte Sr. Irrevocable Life Insurance Trust (which they created), designating the trust as the policy's owner and beneficiary. This was an irrevocable trust, with Davis as trustee. The defendants paid (in the name of the trust) the premiums on the insurance policy; Bonaparte paid nothing.

Life insurance trusts are nothing new; they are a familiar way of shielding the proceeds of a life insurance policy from liability for estate tax. See Jon J. Gallo, "The Use of Life Insurance in Estate Planning: A Guide to Planning and Drafting—Part I," 33 *Real Property, Probate & Trust J.* 685, 728–29 (1999). The wrinkle here is that the defendants were creating trusts in the names of the insured in order to conceal from Ohio National the fact that they rather than the insured controlled the policy and that they planned to sell it as an investment. The need for concealment arose from the fact that an insurance policy would be more valuable to an investor the sooner the insured could be expected to die and therefore the proceeds of the policy realized, but by the same token more costly to the insurance company because it would receive fewer premiums and have to pay the policy proceeds sooner. In addition, controlling as they did the insurance applications, the defendants could conceal some of the vulnerabilities of the (nominal) insured—make him appear

more prosperous, healthier, and in short likelier to live a longer time than was realistic to expect.

The defendants needed a real person to be the insured—they targeted elderly people because of their diminished life expectancies and African-Americans because the average life expectancy of an African-American is shorter than that of other Americans—whose death would trigger the death benefits. The reason the insured had to be a real person is that proof of death is necessary to collect life insurance proceeds. Presumably the defendants arranged with the insureds to have the family of an insured give the defendants a copy of the death certificate upon his or her death.

By having a real person buy a policy insuring his life, the defendants were trying to appear to comply with the legal requirement, discussed below, that one who buys an insurance policy must have an interest in the continued life of the insured rather than in his early death. Ohio National presumably does some research to make sure its insureds are real people, although it didn't do enough to discover and protect itself against what the defendants were doing.

So the defendants had named Bonaparte's trust the "Charles M. Bonaparte Sr. Irrevocable Life Insurance Trust" in order to hide the fact that Bonaparte's life insurance policy was financed by a third party. For to the insurance company it looked like a normal insurance transaction—it's common for people to create life insurance trusts, with the life-insurance policy as the trust's asset because, as we said, there are tax benefits. But the defendants in this case were creating life-insurance trusts to hoodwink Ohio National.

Although each trust was the beneficiary of an insurance policy, the trust documents would list either members of the insured's family or the insured's other trusts as the trust beneficiaries, thereby also making them the beneficiaries of the policy, since the policy was the trust's asset. A few weeks or months after the creation of each trust, however, Davis would have the nominal buyer of the policy (such as Charles Bonaparte) assign the beneficial interest in the trust (and therefore in the policy) to a company owned by another defendant, Paul Morady, Mavash Morady's husband. Paul would make the initial premium payments to Ohio National but then resell the beneficial interest in the trust to an investor who hoped that the insured would die soon, for upon his death the investor would obtain the proceeds of the policy because he now was its beneficiary. Having acquired the beneficial interest in the policy the investor would pay the remaining premiums as they came due. (Defendant Steven Egbert was one of the investors; at the end of this opinion we discuss his special status in the case.)

Ohio National would not have sold the policies to the persons recruited by the defendants had it known that the premiums would be paid or financed by an unrelated third party (an investor) in the expectation that the policy would be transferred to him. The company's contracts with its agents, such as Mavash Morady, required them to conform to its business-practice advisories, which contained an "absolute prohibition against participation in any type of premium financing scheme involving an unrelated third party"—an exact description of the defendants' stranger-originated life insurance scheme.

An insurance policy on a person's life generally is void if the person did not consent to the issuance of the policy. See *Bajwa v. Metropolitan Life Ins. Co.*, 804 N.E.2d 519, 526–29 (Ill. 2004). For remember that the beneficiary of a life insurance policy has a financial interest in the insured's dying as soon as possible, not only because this minimizes the amount of premiums the beneficiary has to pay, see Susan Lorde Martin, "Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization," 13 *U. Pa. J. Business Law* 173, 173–74 (2010), but also because of the time value of money— a given amount of money is worth more if received today than if received a year from now, because if received today it can be invested and as a result it probably will be worth more in a year. So the requirement of consent protects the prospective insured; he is unlikely to consent to someone becoming the beneficiary if he suspects that person of wanting to shorten his life.

Along with the potential for foul play if a person is allowed to have his life insured by whoever wants to own a policy on his life, courts are concerned with the unseemliness of gambling on when a person will die. Because of both concerns, one can't take out a life insurance policy on a person unless one has an interest, financial or otherwise, in the life of the insured rather than in his early death. *Grigsby v. Russell*, 222 U.S. 149, 155 (1911) (Holmes, J.).

Although the defendants did not attempt to off the insureds, they did target as nominal buyers individuals who they thought would have short life expectancies, and, as we said, made them appear to have better survival prospects than they did. Paul Morady testified that he "niched in African-Americans" and that "African-Americans have … short-

er life expectancy than white Americans; therefore, the sale of their beneficial interest should be more attractive" to investors. In addition, the defendants gave the insurance applications, including health information about the insureds, to prospective investors (prospective buyers of the beneficial interests in the insurance policies), thus enabling potential investors to calculate the expected value of such an investment.

Despite the fact that purchasers of a life insurance policy as an investment also have a financial stake in the insured's early death (the stake is at its maximum if the insured dies before the investor pays his first premium), the law allows an investor to purchase the beneficial interest in an existing policy on the life of the insured. *Hawley v. Aetna Life Ins. Co.*, 125 N.E. 707, 708–09 (Ill. 1919). There are social benefits, thought to exceed the social costs discussed above, to these transactions. The owner of the policy may have a desperate need for money; the policy may be his only substantial asset; and if he's elderly or in very poor health the present value of that asset may be substantial and he may have a pressing interest in being able to cash it in by selling the beneficial interest. And provided that the procurer of the policy has an insurable interest, he can designate as the beneficiary someone who does not have an insurable interest. *Bajwa v. Metropolitan Life Ins. Co.*, 776 N.E.2d 609, 617 (Ill. App. 2002), affirmed (as modified on other grounds), 804 N.E.2d 519 (Ill. 2004).

Under the terms of the policies in this case, the owners alone had the right to change the beneficiaries. Cf. 4 Steven Plitt et al., *Couch on Insurance* § 60:15 (3d ed. rev. 2015) ("when the insured is not the owner of the policy, the in-

sured has no power to change the beneficiary as that power resides in the owner"). The owners were the irrevocable life insurance trusts, with Davis managing the policies as the trustee. Although family members, or other trusts, of the insureds were listed as the trust beneficiaries, the beneficial interests were transferred to Paul Morady's company within a few months of the creation of the trusts, through contracts prepared by Davis and signed by the insureds and the trust beneficiaries. The insureds merely lent their names to the insurance applications, in exchange for modest compensation, and the defendants forthwith transferred control over (effectively ownership of) the policies to themselves. The defendants, who had no interest in the insureds' lives (as distinct from their deaths), initiated, paid for, and controlled the policies from the outset.

While "a man who purchased insurance on his own life could validly assign or sell the policy to a person lacking an insurable interest in the insured's life, … 'cases in which a person having an interest lends himself to one without any, as a cloak to what is, *in its inception*, a wager, have no similarity to those where an honest contract is sold in good faith' to a stranger." *PHL Variable Ins. Co. v. Bank of Utah*, 780 F.3d 863, 867–68 (8th Cir. 2015) (emphasis in original), quoting *Grigsby v. Russell*, *supra*, 222 U.S. at 156. Our case is not one in which "a policy was procured in good faith by the person himself to be assigned thereafter," but instead one "in which the policy was procured by a person who had no insurable interest in the life of the person insured, thus making [it] a wager contract." *Hawley v. Aetna Life Ins. Co.*, *supra*, 125 N.E. at 708.

It's true that *PHL* (decided under Minnesota law) held that a stranger-owned life insurance policy was not void for lack of an insurable interest. But there the resemblance between that case and this one ends. In *PHL* a man had bought a $5 million insurance policy on his own life with the proceeds of a premium-financing loan that he obtained from a bank with the intention of later selling the policy to an investor. He owned the policy for two years, at the end of which period, not having sold it, he surrendered it to repay the loan. Thus the purchase of the policy was not "a mere cover for taking out insurance in the beginning in favor of one without [an] insurable interest," *PHL Variable Ins. Co. v. Bank of Utah*, *supra*, 780 F.3d at 865–66, 869, quoting *Peel v. Reibel*, 286 N.W. 345, 346 (Minn. 1939), because the insured owned and controlled the policy before attempting to sell it. The insureds' family members in the present case retained beneficial interests in the policies only briefly and never controlled the trusts. The insureds were the defendants' puppets and the policies were bets by strangers on the insureds' longevity.

Consistent with the authorities cited above, the common law of Illinois, which furnishes the rule of decision in this case, has for at least a century and a half prohibited the purchase of an insurance policy by a person who has no interest in the survival of the insured. See *Guardian Mutual Life Ins. Co. v. Hogan*, 80 Ill. 35, 44–46 (1875). Arrangements like the defendants' STOLI scheme are now prohibited by statute as well, see 215 ILCS 159/50(a), 159/5, though these provisions, enacted in 2009, were not yet in effect when the policies challenged in this case were issued.

The district court found that Mavash Morady's conduct constituted fraud and a breach of her contract with Ohio National and awarded the insurance company as damages the $120,000 that she had received as commissions as an insurance agent for the company. She admitted knowing that the premiums on the disputed policies would be paid by her husband, who had no interest in the continued life of the insureds and planned to sell the policies to investors. Such premium-financing arrangements were forbidden by her contract with Ohio National because as we pointed out earlier the defendants' scheme hurt the company. Mavash Morady argues that she wasn't responsible for the false statements on the applications for the insurance policies—rather, one of her employees communicated with the insureds and completed the forms. Yet her signature appears on the forms, which moreover include information that she knew was false—for example, statements that she knew the insured persons. She knew none of them.

Mavash Morady was only one defendant, and the damages awarded Ohio National were not limited to her fraudulent conduct, but were based more broadly on the tort of civil conspiracy, which is committed "when two or more people combine to accomplish, through concerted action, either an unlawful act or a lawful act in an unlawful manner." *Multiut Corp. v. Draiman*, 834 N.E.2d 43, 51 (Ill. App. 2005); see also *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). The defendants conspired to violate Illinois' common law prohibition against insurance contracts procured by persons who don't have an insurable interest. The defendants argue that they didn't know that such contracts are illegal. That is hard to believe but in any event ignorance of the law is no

defense (with some exceptions, none applicable to this case however).

Ohio National was the target of the conspiracy. The defendants concealed the fact that they, rather than the insureds, controlled the insurance policies from the outset by listing the irrevocable trusts as the owners, and that they would use their control to transfer income from the insurance company to themselves and their investors by accelerating the receipt of insurance proceeds by their choice of the insureds and by false representations of the insureds' life expectancy. The net loss that the scheme ended up causing Ohio National (beyond the commissions paid to Mavash Morady) consisted of the more than $605,000 that the company incurred in litigation expenses to void the policies in order to thwart efforts by the investors to collect policy proceeds upon the death of the insureds (persons to whom Ohio National would never have sold policies at normal premiums had it known in whose hands the ownership of the policies would end up). The total death benefits specified in the illegal policies amounted to $2.8 million, and Ohio National faced the prospect of being sued for those benefits when the persons insured by the policies died. By voiding the policies the insurance company accelerated its defense against the claims that the investors were bound to make when the insureds died.

Of course generally the victorious party to a lawsuit can't charge his litigation expenses to the loser. But that is not what Ohio National is doing. It is seeking reimbursement of the expenses it has incurred in this litigation in order to avoid future litigation over the death benefits in the policies that it was fraudulently induced to issue. "[W]here the

wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expense to protect his interest, the plaintiff can then recover damages against such wrongdoer, measured by the reasonable expenses of such litigation, including attorney fees." *Ritter v. Ritter*, 46 N.E.2d 41, 44 (Ill. 1943); see also *National Wrecking Co. v. Coleman*, 487 N.E.2d 1164, 1166 (Ill. App. 1985); *Sorenson v. Fio Rito*, 413 N.E.2d 47, 51–52 (Ill. App. 1980); cf. *Nalivaika v. Murphy*, 458 N.E.2d 995, 997 (Ill. App. 1983); *Fednav International Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 840 (7th Cir. 2010); *Restatement (Second) of Torts* § 914(2) (1979).

It's true that Ohio National hasn't been forced into litigation with those other parties, and that under Illinois law "where an action based on the same wrongful act has been prosecuted by the plaintiff against the defendant to a successful issue, he can not in a subsequent action recover, as damages, his costs and expenses in the former action." *Ritter v. Ritter*, *supra*, 46 N.E.2d at 44. But the exception carved by *Ritter* in the passage we quoted earlier covers this case. The defendants' misconduct placed Ohio National in the position of potentially having to litigate with the purchasers of the insurance policies upon the death of the insureds, and the expenses it incurred in the present suit to avoid such litigation by voiding the policies were in lieu of the future litigation that it would otherwise have had to engage in at considerable expense. It paid in advance, as it were, the expenses "in litigation with third parties … necessary to … protect [its] interest," to quote from the *Ritter* opinion.

So Ohio National gets its attorney's fees but also gets to keep the premiums paid by the defendants (except Egbert,

as we'll discuss) on the voided policies and as a result ends up with more money than if these contracts had never existed. The amount the defendants paid is in dispute. The defendants say they paid $438,000 in premiums on the disputed policies; Ohio National says they paid $105,000; but whatever the amount, the company is entitled to retain the premiums along with the attorney's fees. Being to blame for the illegal contracts the defendants have no right to recoup the premiums they paid to obtain them; allowing recoupment would, by reducing the cost, increase the likelihood of unlawful activity.

One issue remains to be discussed. Steven Egbert, a defendant but not one of the conspirators, had purchased the beneficial interest in one of the stranger-originated life insurance policies as an investment, and to preserve his beneficial interest until the death of the insured (that is, to prevent the insurance policy from lapsing) had paid the required premiums, amounting to $91,000, to Ohio National. He filed a cross-motion for summary judgment asking the district court to declare the policy valid or in the alternative to order the insurance company to return his premiums. The district judge complied with the latter request. The premiums were being held by the district court in escrow, and so the judge simply ordered the premiums sought by Egbert distributed to him from the escrow.

The company asks us to reverse the judge's order, arguing that Egbert knew or should have known that he had bought an interest in a void contract. Generally when an illegal contract is voided, the parties "will be left where they have placed themselves with no recovery of the money paid for illegal services." *Gamboa v. Alvarado*, 941 N.E.2d 1012,

1017 (Ill. App. 2011), quoting *Ransburg v. Haase*, 586 N.E.2d 1295, 1298 (Ill. App. 1992). But there is an exception for the case in which the party that made the payments is not to blame for the illegality. *Id.* There is no evidence that Egbert knew the policy was void and, as we've said, the assignment of an insurance policy to an investor is not itself unlawful. Had he known it was void he would not have paid the premiums. They were intended to compensate the company for having to pay the death benefit to the policy's beneficiary (Egbert) when the insured died. Since the policy was void from the outset through no fault of his, the premiums were not an offset against the proceeds to the policy's beneficiary, because there would be no proceeds. Retention of the premiums would thus have been a windfall for Ohio National to which it had no entitlement. See *Seaback v. Metropolitan Life Ins. Co.*, 113 N.E. 862, 864 (Ill. 1916) ("when a policy of insurance never attaches and no risk is assumed, the insured may recover back the premiums unless he has been guilty of fraud or the contract is illegal, and he is in pari delicto"). Egbert paid substantial premiums and got nothing in return. He caused no harm, as he was not involved in the conspiracy. The company would be unjustly enriched if allowed to keep his $91,000.

The entire judgment of the district court is therefore

AFFIRMED.