In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 20-2339 & 20-2472

SUN LIFE ASSURANCE COMPANY OF CANADA,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

WELLS FARGO BANK, N.A., as Securities Intermediary,

*Defendant-Appellant, Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
No. 1:17-cv-06588 — **Philip G. Reinhard**, *Judge.*

———————————

ARGUED MARCH 30, 2022 — DECIDED AUGUST 17, 2022

———————————

Before EASTERBROOK, WOOD, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This diversity action under Illinois law takes us to a corner of life insurance law dealing with insurable interests. For more than a century, courts in Illinois and across the country have tried to balance two general rules. First, the owner or buyer of a life insurance policy, at least at its inception, must have an insurable interest, typically some sort of family and/or financial interest in the continued

life of the insured. If a stranger without an insurable interest buys insurance on another person's life, the purchase is treated as void ab initio as a perhaps dangerous wager on another's life. Second, though, a life insurance policy is a contract and can be a form of property. A person who buys a policy supported by an insurable interest may choose voluntarily to sell, give, or otherwise assign the policy to a third party who does not have an insurable interest in the insured's continued life. Compare *Warnock v. Davis*, 104 U.S. 775 (1881), and *Cisna v. Sheibley*, 88 Ill. App. 385 (1899) (both treating stranger-originated life insurance policies as void), with *Grigsby v. Russell*, 222 U.S. 149 (1911), and *Bloomington Mutual Life Benefit Ass'n v. Blue,* 120 Ill. 121, 11 N.E. 331 (1887) (both allowing sale or assignment of policy first purchased in good faith with proper insurable interest).

This case presents a twenty-first century iteration of the insurable interest problem, in an era with an active secondary market for life insurance policies and even securitization of pools of policies obtained in the secondary market. See generally *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust*, 28 A.3d 1059, 1069–70 (Del. 2011) (providing overview of issues and history). The district court found here that a $5 million life insurance policy was void because it had been purchased through an elaborate sequence of transactions designed to hide from the insurer the fact that there was no proper insurable interest. *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 2020 WL 1503641 (N.D. Ill. Mar. 30, 2020). The paper transactions took the form of a proper policy, but their substance amounted to a void wager on a stranger's life. The court also allowed the insurer to keep almost all of the premiums that had been paid while the policy was in force. In these cross-appeals, we affirm the district court's

judgment, with the one exception of the small portion of the premiums that the district court ordered to be refunded.

I.   *Facts for Summary Judgment*

At the age of 78, Robert Corwell seemed to buy a new $5 million life insurance policy on his life with an annual premium of nearly $300,000. His purchase was the visible part of a complex scheme of legal engineering by several companies to buy a life insurance policy so that its true nature as unlawful stranger-originated life insurance would not be detected. The key facts underlying the purchase and later sale of the policy here are not in dispute. That makes the case suitable for the parties' cross-motions for summary judgment, and our appellate review is de novo. E.g., *Herzog v. Graphic Packaging International, Inc.*, 742 F.3d 802, 805 (7th Cir. 2014). When considering cross-motions for summary judgment, at each stage of the analysis we must draw all reasonable inferences in favor of the party against whom the relevant motion was granted. *Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020). We begin by laying out the undisputed facts, starting with Corwell's purchase of the life insurance policy from plaintiff Sun Life and the later assignment of that policy in the secondary market.

Around 2005, Robert Corwell's insurance broker told him about a program that would allow him to take advantage of the secondary market for life insurance policies. The program was run by a company called Coventry Capital I LLC and was created to increase the supply of life insurance policies available for purchase by investors on the secondary market. As we explain below, Coventry Capital's program essentially provided the insured with free life insurance for a couple of years before a nearly inevitable assignment of the policy to the

strangers who had funded it from the beginning, at no expense or risk to the insured.

A policyholder like Corwell would receive a non-recourse loan to fund his policy premiums. In exchange, he assigned the policy as collateral for the loan. Non-recourse loans can be a legal way to fund insurance policies, but they also raise warning flags indicating that the policy may in fact be stranger-originated life insurance that amounts to a wager on a stranger's life.

The first step of the Coventry Capital program was for Corwell to apply to plaintiff Sun Life on May 31, 2006 for a $5 million life insurance policy on his own life. The application said that the Corwell Family Limited Partnership would be the primary beneficiary of the policy and Corwell would be the owner. Given Corwell's age and health, the expected premiums for the $5 million policy were almost $300,000 per year. The annual premium exceeded Corwell's adjusted gross income in almost every year the policy was in effect.

On Sun Life's premium eligibility worksheet, Corwell said that the premiums would all be paid by individual check, not premium financing. That was not true. Corwell paid for the policy with a non-recourse loan, i.e., secured only by the policy itself, so that he would not be personally liable for the borrowed money. Sun Life would not have issued the policy if it had known that Corwell would be using a non-recourse loan to pay the premiums. But on July 31, 2006, Coventry Capital sent Corwell a letter explaining that it would lend all the money needed to pay the premiums for Corwell's policy. It would do so through a loan it would administer on behalf of LaSalle Bank. Corwell would need to make the initial premium payment on the policy, but he would be reimbursed

promptly as long as he signed over the Sun Life policy to LaSalle Bank as collateral for the loan. Corwell agreed and sent the signed collateral assignment form to Coventry around August 2, 2006. Two days later the Corwell Family Limited Partnership paid Sun Life the initial six-month premium of $147,059, and Sun Life issued the policy to Corwell on August 10, 2006.[1]

As promised, on October 31, 2006, LaSalle Bank provided the non-recourse loan to Corwell, by way of a Trust he created to hold the policy. In exchange, LaSalle Bank received a security interest in the policy. That same day, the Corwell Family Limited Partnership was also reimbursed for the initial premium payment. At that point, Corwell was not out even a penny. To Sun Life, though, he looked like the owner of a brand-new $5 million policy on his life for which he was willing to pay almost $300,000 per year. Under the terms of the loan, on paper Corwell continued to borrow money to pay the policy premiums, but he never saw a dime. The lender paid the money directly to Sun Life for the premiums.

The LaSalle Bank loan had a thirty-month term. In the lead up to the loan's maturity, Coventry sent notices to Corwell in February and March 2009. The notices explained that the loan was coming due at the end of April, that the balance was $569,572, and that Corwell had two options to satisfy the debt—either repay it himself or relinquish his interest in the insurance policy to LaSalle Bank. As everyone involved in the financing expected, Corwell decided in April 2009 to relinquish the policy to LaSalle Bank.

---

[1] We refer to several Coventry-related entities, including Coventry Capital, as Coventry except where the differences might be relevant.

After Corwell relinquished the policy, the successor of LaSalle Bank's interest in the policy sold it on August 25, 2009. The buyer was Coventry First LLC, an affiliate of Coventry Capital. Coventry First was in the business of purchasing life insurance policies on the secondary market. It was acting under an agreement to procure policies exclusively for AIG Life Settlements LLC if the policies met certain criteria. The insured had to be 60 years old or older with a life expectancy of more than 25 months but less than 180 months, and the policy had to have been in force beyond the contestability and/or suicide period. (That period is no more than two years in Illinois, 215 Ill. Comp. Stat. § 5/224(1)(c); hence the 30-month term of the original loan to Corwell.)

Coventry First did not simply happen upon Corwell's policy in 2009 when LaSalle Bank's successor transferred it. Rather, Coventry First had been part of the original scheme in 2006, when Corwell was preparing to purchase a life insurance policy from Sun Life with the promise that his first premium would be reimbursed and that he would never need to pay another penny for the policy. Even back then, Coventry First was planning with AIG to purchase Corwell's policy when it would probably become available on the market. In August 2006, AIG notified Coventry First that the information it had provided about Corwell's age, health, and the planned policy met its criteria for a purchase, with the basic message "case approved."

Two years later, after Corwell relinquished the policy, Coventry First purchased it from the successor to LaSalle Bank's interest with AIG's renewed approval, as required by their exclusive agreement. Coventry First then transferred its interest in Corwell's policy to AIG, through AIG's agent,

defendant Wells Fargo. Wells Fargo was then named the policy's new record owner. Wells Fargo continued to make the premium payments for the policy. It did so on behalf of AIG, later Blackstone, and later still Vida Longevity Fund, L.P., the beneficial owner at Corwell's death.

II. *Procedural History*

Corwell died on June 25, 2017. In July 2017, Wells Fargo submitted a death claim to Sun Life to collect the $5 million death benefit under Corwell's policy. Sun Life filed this suit against Wells Fargo in September 2017. Sun Life sought a declaratory judgment that the policy it had issued to Corwell was void ab initio because it was an illegal wagering contract and was procured for the benefit of strangers who lacked an insurable interest in violation of Illinois law (Counts I and II).[2] Wells Fargo answered and pled several counterclaims against Sun Life, seeking either the policy benefits of $5 million or at least repayment of all premiums paid on the policy. The parties later filed cross-motions for summary judgment.

The district court granted Sun Life's motion, holding that the Corwell policy was void ab initio. *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 2020 WL 1503641 (N.D. Ill. Mar. 30, 2020). The court laid out the complex details of the defendants' scheme and, applying Illinois case law, concluded that the scheme was designed to create the appearance of a proper insurable interest while in substance it was merely a complicated wager on a stranger's life. The court also held that Wells Fargo was not entitled to a refund of any premiums paid on behalf of the participants in the original scheme,

---

[2] Sun Life also sued Corwell's insurance broker, Frank Nelsen. Those claims were dismissed pursuant to a settlement.

which added up to more than $1.8 million. Finally, though, the court granted summary judgment in favor of Wells Fargo for reimbursement of about $13,000 it had paid as premiums for the last beneficial owner of the Corwell policy, Vida Longevity, on the theory that Vida was an innocent buyer. Wells Fargo has appealed the portions of the judgment adverse to it, and Sun Life has cross-appealed the portion ordering the small premium refund for payments made on behalf of Vida.

III. *Analysis*

The central issue here is whether the circumstances of the Corwell policy show a good-faith purchase supported by a legitimate insurable interest, which Corwell then decided to sell in the secondary market, or show instead an elaborate scheme to disguise what was in substance a stranger's illegal wager on Corwell's life. The question is governed by Illinois law. We agree with the district court that the undisputed facts show this was the latter, an unlawful wager, making the policy void ab initio. Available guidance from Illinois case law, from the late nineteenth century to the late twentieth century, teaches us to focus on the underlying substance of the transactions. We agree with Judge Reinhard that the substance of this deal was unmistakably an illegal wager on a stranger's life.

A.  *Legal Standard*

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and 28 U.S.C. § 1652, our task is to decide a question of state law "as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 632 (7th Cir. 2020), quoting *Allstate Insurance Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002).

B.	*Lack of Insurable Interest and Unlawful Wager*

Illinois law prohibits the initial sale of a life insurance policy to someone who has no insurable interest in the life of the insured. *Hawley v. Aetna Life Insurance Co.*, 291 Ill. 28, 30, 125 N.E. 707, 708 (1919); see also *Bajwa v. Metropolitan Life Insurance Co.*, 333 Ill. App. 3d 558, 567, 776 N.E.2d 609, 616–17 (2002), aff'd as modified on other grounds, 208 Ill. 2d 414, 804 N.E.2d 519 (2004). An insurable interest is present when the policyholder has "an interest in having the life [of the insured] continue." *Colgrove v. Lowe*, 343 Ill. 360, 363, 175 N.E. 569, 571 (1931), quoting *Grigsby v. Russell*, 222 U.S. 149, 155 (1911). Thus, an insurable interest exists for example when a person takes out an insurance policy on his own life, *Hawley*, 291 Ill. at 31, 125 N.E. at 708; see also *Bajwa*, 333 Ill. App. 3d at 568, 776 N.E.2d at 617, or usually on the life of a close family member, *Bowman v. Zenith Life Insurance Co.*, 67 Ill. App. 3d 393, 394, 384 N.E.2d 949, 950 (1978), or when the policyholder is a creditor of the insured, *Martin v. Stubbings*, 126 Ill. 387, 403–04, 18 N.E. 657, 660 (1888), or otherwise has a financial interest in the insured's continued life, *Guardian Mutual Life Insurance Co. of New York v. Hogan*, 80 Ill. 35, 44–46 (1875).

A pure wager by contrast exists when a policy is first purchased or controlled by a party without an insurable interest. Such a policy "gives the [policyholder] a sinister counter interest in having the life [of the insured] come to an end." *Bowman*, 67 Ill. App. 3d at 394, 384 N.E.2d at 950, quoting *Grigsby*, 222 U.S. at 154.

Only the initial policyholder must have an insurable interest. Once that requirement is met, at least in good faith, a beneficiary may be designated, or the policy may be sold or given to someone who lacks an interest in the life of the insured.

*Bajwa*, 333 Ill. App. 3d at 568, 776 N.E.2d at 617–18. For example, the insured might designate a favorite charity as a beneficiary as a way to make a substantial cash gift upon the insured's death. The justification for limiting the insurable interest requirement to the initial policyholder is that people who have bought policies that no longer meet their needs should be able to take advantage of the secondary market for insurance policies as a mechanism for investment and saving. *Hawley*, 291 Ill. at 31–32, 125 N.E. at 708, citing *Grigsby*, 222 U.S. at 155–56. Also, the concerns that arise when a stranger holds a policy on the life, and thus would benefit from the death, of another person are presumably lessened when a policyholder who herself has an insurable interest chooses who will benefit financially from the death of the insured in the first instance. *Grigsby*, 222 U.S. at 155–56.

### 1.  *Form and Substance Under Illinois Insurance Cases*

The tension between these two general principles has tempted people who want to wager on the lives of strangers to try to structure their transactions to create the appearance of a legitimate insurable interest. Accordingly, Illinois courts have long looked "beyond the mere form of the transactions." *Cisna*, 88 Ill. App. at 389. In *Cisna*, the dispute was over the proceeds of a life insurance policy for an insured with whom the parties had no relation that would have supported an insurable interest. The almost ghoulish facts illustrate well the need for looking at the substance, not just the form, of such transactions. Cisna was a doctor; Sheibley was an investor and life insurance broker. Cisna claimed that they had formed a partnership to pay selected patients of his to buy life insurance policies. He said that he and Sheibley had agreed to pay 10% of the death benefits to the decedent's family and 5% each

to Cisna and Sheibley, with the remaining 80% of the death benefits to be divided between Cisna and Sheibley according to the cash they provided for the particular policy.

In the case that reached the courts, the insured decedent had bought a policy on his own life, albeit with money from Cisna and Sheibley, and he had named his wife as the beneficiary. *Id.* at 387. On its face, then, the policy looked as if it was supported by an insurable interest.

Looking to the substance of the transaction, however, the court determined that the transaction added up to an unlawful wager on the life of the insured. *Id.* at 389. The court pointed to evidence that Cisna and Sheibley had engaged in a business of procuring policies for Cisna's patients, that those patients would never have bought such insurance for themselves, and that Cisna and Sheibley had paid all the expenses and premiums for the policy. *Id.* at 388–89.

Even more important for our purposes, the court recognized that Cisna and Sheibley had agreed that someone with a legitimate insurable interest would actually receive a fraction of the death benefits—10% to the widow of the insured. That was the window dressing to conceal the strangers' wager on the patient's life. Looking to the substance of the transactions, the court still found that Cisna and Sheibley had made an illegal and void wager on the patient's life. The court therefore dismissed Cisna's effort to have the court enforce his agreement with Sheibley, just as a court would refuse to enforce a bargain between two bank robbers about how to divide the loot. *Id.* at 393.

Similarly, in terms of looking past form to the substance of the insurance transaction, *Guardian Mutual Life Insurance Co.*

*of New York*, 80 Ill. 35, considered in part whether a family relationship between the insured and policyholder was necessarily sufficient by itself to satisfy the insurable interest requirement. The court held that it was not. *Id.* at 44, 46. Instead, the court approved a jury instruction that required the jury to consider whether the policyholder had a financial interest in the life of the insured or a reasonable expectation of profit or advantage that would be lost if the insured died. *Id.* at 43. Also, even if there appeared to be an insurable interest from that initial inquiry, the policy could still be deemed a wager if the insurance policy was for an amount far greater than the policyholder would lose if the insured died. *Id.* at 44. The court's discussion thus implied that an insurance policy taken out on the life of a close family member, which often does satisfy the insurable interest requirement, may still be declared void depending on the facts and circumstances of the case. See *Bruce v. Illinois Bankers Life Ass'n*, 207 Ill. App. 555, 558 (1917).

In more recent cases, Illinois courts have continued to avoid a singular focus on paper or facial compliance with the insurable interest requirement, choosing instead to consider the substance of the transactions in light of all the facts presented to them. Relying on *Guardian Mutual Life Insurance Co. of New York*, the court in *Bowman* did not stop its inquiry after finding that a father had purchased an insurance policy on the life of his son. 67 Ill. App. 3d at 394-95, 384 N.E.2d at 950-51. Rather, the court also considered whether any other facts suggested that the policy was a wager on the son's life. Because the amount of the policy was "not grossly disproportionate to the extent of [the father's] interest," the court held that the policy was taken out in good faith and supported by a legitimate insurable interest. *Id.*

We are relying primarily on Illinois precedents that date back more than a century, but we do not see signs that the Illinois Supreme Court would likely depart from them today. In fact, the Illinois legislature's codification in 2009 of the prohibition on stranger-originated life insurance supports our understanding of Illinois law's stance on this issue today. 215 Ill. Comp. Stat. 159/50(a). The statute defines stranger-originated life insurance to include "cases in which life insurance is purchased with resources or guarantees from or through a person or entity who, at the time of policy inception, could not lawfully initiate the policy himself or itself." 215 Ill. Comp. Stat. § 159/5. Those provisions were enacted after Corwell's policy was issued, so they do not control this case. They are consistent, though, with Illinois case law rejecting schemes designed to get around the insurable interest requirement.

We thus agree with the district court that if the Illinois Supreme Court were deciding the issue, it would look beyond the form of the transactions and consider the substance of Corwell's purchase to determine whether it was supported by an insurable interest.

This approach to the insurable interest question is also consistent with much more recent circuit precedent and district court decisions considering similar issues of Illinois law. For example, in *Ohio National Life Assurance Corp. v. Davis*, 803 F.3d 904 (7th Cir. 2015), we affirmed summary judgment for the plaintiff insurance company where the insured had procured the policy on his own life but had done so in exchange for promises of direct compensation from the defendant. The insured admitted that he knew from the beginning that he would not receive life insurance or benefit from it, but instead

that he was being paid merely to let the defendant use his name on the application. See *Ohio National Life Assurance Corp. v. Davis*, 13 F. Supp. 3d 876, 880 (N.D. Ill. 2014) (explaining underlying facts). His understanding of what was really happening was confirmed by the fact that he sold his interest in the policy to the defendant before his final application was even submitted and before the insurance company issued the policy. *Id.* at 883. Even more telling, the defendant controlled everything about the policy from the beginning. 803 F.3d at 906–08.

We concluded in *Davis*, after focusing on the substance of the transactions, that the "insureds merely lent their names to the insurance applications," and that it was not a case where "a policy was procured in good faith by the person himself to be assigned thereafter." *Id.* at 908–09 (internal quotation marks and citation omitted). The facts in *Davis* were even more extreme than those presented here, but the general principle still applies: insureds cannot simply lend their names to insurance policies controlled in fact by third parties who have no insurable interest.

Similarly, in *Lincolnway Community Bank v. Allianz Life Insurance Co. of North America*, 2015 WL 7251931 (N.D. Ill. Nov. 17, 2015), the district court evaluated an insurance policy that was purchased in a scheme similar to the one here. The policy was the product of a plan by the policyholder and a friend to take out insurance policies on their family members' lives, funding the premiums with loans, that could be sold. *Id.* at *4. The policyholder made little effort to repay the loan when it was coming due and the lending institution "knew it was inevitable" that the policyholder's friend, who lacked an insurable interest in the life of the insured, would own the policy

upon maturity of the loan. *Id.* at *5. In finding the insurance policy void ab initio on summary judgment, the court emphasized that "[t]echnical compliance with the insurable interest requirement is not dispositive." *Id.* at *3.

### 2. *Application*

With this guidance from Illinois precedent, we agree with the district court that the Corwell policy was not legitimately supported by an insurable interest and that Corwell, in the words of Justice Holmes, merely lent himself "as a cloak to what is, in its inception, a wager." *Grigsby*, 222 U.S. at 156. On its face, Corwell's policy appeared to satisfy the insurable interest requirement. Corwell had an insurable interest in his own life. He also had nominal control over the policy, as settlor of the family trust, up until he relinquished it to LaSalle Bank to pay off the loan that was used to pay the policy premiums for the first two years. Although LaSalle Bank held the policy as collateral for the loan, Corwell was not *legally* obliged to relinquish the policy to LaSalle Bank when the loan came due. Instead, he had the options (a) to pay off the loan with his own funds and start paying the premiums on his own, (b) to sell the policy and use the proceeds to pay off the loan, or (c) to relinquish the policy to LaSalle Bank.

According to Wells Fargo, Corwell's policy is valid because Corwell's nominal control of the policy distinguishes this case from others like *Davis*, where the defendant investor controlled the policy even before it was issued. We disagree. The absence of an explicit agreement up front to give the investors a portion of the proceeds, as in *Cisna*, 88 Ill. App. at 388–89, or a more obvious quid pro quo agreement, as in *Davis*, 803 F.3d at 906, does not make Corwell's policy valid. Those are not the only circumstances that lead to the

conclusion that a policy was an unlawful wager. See *Lincoln-way Community Bank*, 2015 WL 7251931 (concluding that insurance policy was a wager where there was an understanding, although not explicit, that the investor would end up with the insurance policy for an insured in whose life he had no insurable interest).

The undisputed facts about the arrangements to fund this policy show that it was an unlawful wager by strangers on Corwell's life. Even viewing the evidence in Wells Fargo's favor, there is no genuine dispute about the facts that (1) Corwell's policy was part of a broader scheme to secure another life insurance policy for the Coventry entities; (2) Corwell did not need and could not afford the policy himself; (3) the financing for the policy had been concealed from Sun Life; and (4) there was no serious risk that Corwell would sell the policy or retain it for himself.

First, although Corwell took out the policy on his own life, he did so only as part of the elaborate scheme to provide the Coventry entities with another insurance policy on a stranger. It started when Coventry Capital created the loan program to increase the supply of available life insurance policies on the secondary market. The program basically provided Corwell with free life insurance for about two and a half years before he would relinquish the policy to pay off the loan that had been used to pay the premiums up to that point. Corwell's insurance broker, who was an advocate for Coventry Capital's program, informed Corwell about the opportunities for financial gain that the program provided and helped him apply for a new insurance policy with Sun Life.

While Corwell and his broker were working to buy the policy in the spring and summer of 2006, at the same time

concealing the arrangements from Sun Life, Coventry First and AIG were reviewing information about Corwell and his prospective policy to determine if it would satisfy the requirements of their exclusive agreement for AIG to take over the policy. Two years later, as the deadline for paying off the premium loan approached, Coventry First and AIG prepared for the final step of the whole plan—buying the policy after Corwell would be surrendering it. In July 2008, a Coventry representative re-sent information about Corwell and his policy to AIG and laid out the contingencies associated with a potential purchase. With that information, AIG again approved the purchase of the policy. In the end, everything worked out as planned. Corwell surrendered his policy, and Coventry First bought it and then transferred it to AIG.[3]

Second, it is true that Corwell had a legal right to sell the policy or to keep it for himself, but the facts show that "no one expected [either of those options] to be a realistic possibility." *Lincolnway Community Bank*, 2015 WL 7251931, at *5. For one, Corwell purchased the policy when he was 78 years old and

---

[3] One might reasonably wonder why the secondary market works at all, as a matter of economics, to offer profits to buyers of insurance policies on strangers. One answer is the ability to select policies that are likely to pay off (i.e., the insureds will die) on average sooner than actuaries would predict for a larger and more random selection of policies. In essence, asymmetrical information about the life expectancy of the insureds offers profits. A second answer is that life insurance is priced based on experience with policies held by insureds and their family members, who choose or allow a predictable proportion of policies to lapse so that the insurer never needs to pay the death benefits. Professional investors who buy policies in the secondary market, on the other hand, will virtually never allow a policy to lapse. See, e.g., Susan Lorde Martin, *Life Settlements: The Death Wish Industry*, 64 Syracuse L. Rev. 91, 121–22 (2014).

agreed to pay almost $300,000 in premiums annually. Corwell's accountant testified that during the years the policy was in effect, Corwell's adjusted gross income was never higher than $472,000 and most years was less than the nearly $300,000 in annual premiums for the policy. Keeping the policy and paying the premiums himself was not going to be a practical option for Corwell.[4]

There is no evidence that Corwell himself sought help with selling the policy to anyone else, as opposed to just relinquishing the policy to LaSalle Bank. Corwell's broker testified that, as the loan's maturity date was approaching, the broker and the company he worked with would have shopped around the policy on the secondary market. The record indicates there was actually one offer from "Welcome Funds" in September 2008 to the company the broker worked with to buy the policy for $590,000. That was more than the loan payoff amount and might have put some cash in Corwell's pocket. But no one from the brokerage company or Coventry even informed Corwell's broker, let alone Corwell himself, about that offer, further reinforcing the fact that

---

[4] We can speculate that under one possible scenario, Corwell might have decided to pay off the loan himself and take over the policy. If he had learned before the end of the 30-month loan term that his life expectancy had become much shorter, such as with a new and dire medical diagnosis, he or a family member might have been motivated to pay off the loan to obtain the $5 million policy and to keep paying premiums. In that event, the parties who financed the original purchase of the policy would have received their money back, with interest, but without the payment of the policy face value upon Corwell's death. That unlikely prospect does not change the substance of this stranger's wager on his life.

Corwell's surrender of the policy was likely and that his nominal control over the policy was only illusory.

Our conclusion that Corwell's policy was a stranger's wager is in line with decisions by other courts in cases about Coventry's program. See *Sun Life Assurance Co. of Canada v. U.S. Bank N.A.*, No. 14-civ-62610, 2016 WL 161598, at *17 (S.D. Fla. Jan. 14, 2016), rev'd in part on other grounds, 693 F. App'x 838 (11th Cir. 2017) (granting in part summary judgment under Delaware law; policy funded by Coventry loan was wagering instrument; transaction was "simply smoke and mirrors meant to obscure the identity of the party responsible for procuring the Policy"); *U.S. Bank N.A. v. Sun Life Assurance Co. of Canada*, No. cv 14-4703, 2016 WL 8116141, at *18 (E.D.N.Y. Aug. 30, 2016) (granting summary judgment under Delaware law; insurance policy was void ab initio where facts showed that "Coventry improperly used [the insured] as a conduit to acquire a policy that it could not otherwise acquire"), report and recommendation adopted by 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017).

### 3. *Additional Counterarguments*

Wells Fargo makes two further arguments on the merits. First, it contends that this was not a scheme to benefit Coventry entities because no Coventry entity was the lender for the loan program or had the power to decide to whom or at what price the policy would be sold. Wells Fargo adds that the Coventry entity that held the interest in the LaSalle Bank loan was not the true lender for the program because it received the money to purchase that interest from a non-Coventry entity. Also, Wells Fargo asserts that the liquidation agent in control of selling Corwell's policy was not associated with Coventry and was responsible to a non-Coventry entity.

This argument focuses on the complex technical form of the transactions rather than the substance underlying them. Again, the undisputed facts show that everything was structured so that as long as Corwell survived for 30 months from the policy's issuance, Coventry First was likely to obtain the Corwell policy and transfer it to AIG. All Corwell provided was a human life and insurable interest—he risked and paid not a penny for the policy. (And if Corwell had died before the transfer of the policy, the lender would have been repaid with interest out of the policy proceeds, so the lender and its confederates would never lose their money.)

Second, Wells Fargo asserts that, instead of blocking the only other offer to buy Corwell's policy, from Welcome Funds, Coventry actually encouraged Corwell to take that offer because it could not match it. Wells Fargo cites evidence that a Coventry First representative said that "he thought not accepting [the] offer: (1) was 'crazy'; (2) posed 'a huge risk' to Corwell; and (3) 'makes no sense to me.'" But the cited exchange was not about the Welcome Funds offer in September 2008. That offer was never even communicated to Corwell himself. Instead, the "crazy" exchange was about an offer the brokerage company made to sell Corwell's policy in November 2008 for $300,000 over the loan balance. (The response was: "seriously? 300k? your best offer [the Welcome Funds offer] was 30k over the loan before—you want 10 times that????") There is no evidence that Coventry encouraged Corwell to take any non-Coventry offer.

We agree with the district court that Corwell's policy was an unlawful wager on his life regardless of the surface details of the transaction that created the appearance of a legitimate

insurable interest. Summary judgment therefore was appropriate for Sun Life on Counts I and II of its complaint.

Our conclusion that Corwell's policy was a pure wager by strangers does not imply that people cannot take policies out on their own lives, have them financed by third parties, and then sell them in good faith. See *Grigsby*, 222 U.S. at 155–56; *Blue*, 120 Ill. at 124–25, 11 N.E. at 332. The problem here is that Corwell himself made no investment and took no risk. Instead, the transactions were designed carefully from the beginning to ensure that a "stranger" ended up with the policy and to conceal those arrangements from Sun Life. Illinois courts protect the freedom of insureds to use policies for their benefit, when they have purchased them in good faith. Illinois courts have given no sign that they intend to permit the sort of evasion of the insurable interest requirement shown here.

C. *The Premiums Paid*

The next issue is Wells Fargo's alternative counterclaim that, even if it cannot recover the $5 million face value of the Corwell policy, Sun Life should be required to return all premiums paid for the void policy. Recall that the district court held that Sun Life was entitled to retain the premiums paid except for about $13,000 paid on behalf of the last beneficial owner of the Corwell policy, Vida.

1. *Legal Standard*

Illinois law generally leaves "parties to a void contract … where they have placed themselves with no recovery of the money paid for illegal services." *Gamboa v. Alvarado*, 407 Ill. App. 3d 70, 75–76, 941 N.E.2d 1012, 1017 (2011), quoting *Ransburg v. Haase*, 224 Ill. App. 3d 681, 686, 586 N.E.2d 1295, 1298 (1992). There are exceptions for cases "where (1) the

person who paid for the services was not *in pari delicto* ('in equal fault') with the offender and (2) the law in question was passed for the protection of the person who paid for the services and the purpose of the law would be better served by granting relief than by denying it." *Id.*, citing *Ransburg*, 224 Ill. App. 3d at 686, 586 N.E.2d at 1298–99. In insurance law, there is a narrow exception: "when a policy of insurance never attaches and no risk is assumed, the insured may recover back the premiums unless he has been guilty of fraud or the contract is illegal, and he is in pari delicto." *Seaback v. Metropolitan Life Insurance Co.*, 274 Ill. 516, 521–22, 113 N.E. 862, 864 (1916). The exception tries to prevent unjust enrichment of an insurance company that sold a void policy where the insured was blameless. Accord, *National Union Fire Insurance Co. of Pittsburgh v. DiMucci*, 2015 Il. App. (1st) 122725 ¶ 67, 34 N.E.3d 1023, 1043 (2015).

2.  *Recovery of the Full Policy Premiums*

Wells Fargo argues that it is entitled to a refund of all the premiums it paid on the Corwell policy under a theory of unjust enrichment because it and Vida were innocent in the wager scheme. An important preliminary question however is whether Wells Fargo is entitled to recover the premiums paid on behalf of the prior beneficial owners of Corwell's policy, such as AIG and Blackstone.

First, Wells Fargo itself has no entitlement in its individual capacity to recover any of the premiums it paid to Sun Life for Corwell's policy. Although Wells Fargo had been the *record* owner for Corwell's policy since 2009, *beneficial* ownership was transferred several times, first from Coventry First to AIG and then to Blackstone and then to Vida. Wells Fargo has never had a beneficial interest in the Corwell policy and never

used its own money to pay premiums. It was always only a "securities intermediary," i.e., a conduit for the (hidden and complicit) beneficial owners. Wells Fargo has *not* asserted that it deserves a refund so that it can in turn repay AIG and Blackstone. And AIG and Blackstone are not parties to this case and have not tried to make a case as innocent buyers. So even if we were troubled by the prospect that Sun Life would retain the premiums paid for this wager, and we are not, Wells Fargo has not shown that it is a deserving recipient of the equitable relief it seeks.

Second, to the extent that Wells Fargo is arguing that all premiums should be refunded to it so it can in turn pay them to Vida, the beneficial owner of the policy at the time of Corwell's death, it is hard to see how Vida could ever have any claim to a refund of anything more than the $13,000 in premiums it paid itself through Wells Fargo. See *Seaback*, 274 Ill. at 522–23, 113 N.E. at 864 (limiting who can seek refund of premiums paid for insurance policies that were void ab initio). Wells Fargo also did not offer evidence or argument in the district court that would let Vida assert claims for itself to the premiums that AIG and Blackstone paid through Wells Fargo.

Wells Fargo argues that we should focus not on any issue of its entitlement to restitution but instead on the unjust enrichment of Sun Life. Wells Fargo cites *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 807 N.E.2d 439 (2004), as support. Wells Fargo is mistaken in its understanding of *Raintree Homes* and how it applies to this case. In *Raintree Homes*, the plaintiffs argued that if the court found a local ordinance requiring a fee to obtain a building permit was invalid, then the plaintiffs should be refunded all the fees they had paid under it. *Id.* at 251, 807 N.E.2d at 441. One issue was

whether the plaintiffs' request for a refund was one for dam-
ages or restitution (under a theory of unjust enrichment). The
court deemed the claim one for restitution because plaintiffs
were asking for the money they had paid to be returned, not
to be compensated for a loss of capital resulting from their in-
ability to use that fee money for other purposes. *Id.* at 257, 807
N.E.2d at 445. Because the plaintiffs were not seeking to re-
cover for those losses, the court concluded, "the amount of the
award will be measured by the [defendant's] unjust gain, ra-
ther than the plaintiffs' loss." *Id.*

The *Raintree Homes* court did not say, however, that the
plaintiffs could recover the fees regardless of whether they
had actually paid them. It said instead that it did not need to
consider those additional losses because this was a claim for
restitution, i.e., a return of money improperly obtained. Put in
the context of our case then, the fact that Wells Fargo never
paid premiums for itself but was doing so on behalf of other
entities is relevant and precludes it from recovering the pre-
miums itself.[5]

---

[5] Wells Fargo also argues that Sun Life should not be allowed to retain
the premiums because that would give it an unjust windfall and reward it
for the delay in challenging the policy's validity. Wells Fargo contends
that Sun Life knew in 2009 that Corwell had used a non-recourse loan to
fund the policy premiums for the policy he procured in 2006. Yet Sun Life
continued to collect premiums from Wells Fargo and waited until Cor-
well's death to claim the policy was an unlawful wager. It is true that
when Corwell was applying for another Sun Life policy in 2009, Sun Life
learned that the premiums for the 2006 policy were in fact funded by a
non-recourse loan, despite Corwell's 2006 application indicating other-
wise, and that the 2006 policy had been sold. As a result, Corwell's 2006
policy was not actually in compliance with Sun Life's then-current prac-
tices on premium financing, and Sun Life would not have issued the 2006
policy if Corwell and his broker had been honest in the application.

### 3. *Recovery of Vida's Premium Payments*

The last issue we must address has low monetary stakes in this case but may be important for the secondary market in life insurance. The question is whether Wells Fargo is entitled to a refund of the roughly $13,000 in premiums paid by Vida, through Wells Fargo, to Sun Life. The district court ordered Sun Life to make that refund, and Sun Life has cross-appealed that portion of the judgment. See *Sun Life Assurance Co. of Canada*, 2020 WL 1503641, at \*15. The court said that there was no evidence that Vida was complicit in the unlawful wager scheme. *Id.* With respect, we conclude that the district court erred in this sliver of its judgment.

First, Wells Fargo has not offered evidence or argument to establish its right to collect this refund if it were otherwise appropriate. Vida itself is not a party to this case and has not asserted a right to such a refund.

Even if this problem of the real party in interest or standing were solved so as to permit such a refund to Wells Fargo, there are two more fundamental problems. The refund

Starting around 2005, Sun Life had taken the position that it would no longer issue policies funded with non-recourse loans because of the legal risks and red flags those raised, regardless of whether there was proof that such a policy was stranger-originated life insurance. However, non-recourse funding does not necessarily make a policy illegal as a matter of law. Such funding is legal. More important, Sun Life did not know in 2009 about the broader scheme involving Coventry and AIG that was behind Corwell's policy from the beginning, which is the root of the illegal nature of this policy, and the 2009 discovery of the non-recourse premium financing in 2006 came after the policy's two-year incontestability period had expired. Contrary to Wells Fargo's argument, Sun Life's later knowledge of the loan for Corwell's 2006 policy before he died does not require it to return all or any of the premiums to Wells Fargo.

appears to have been based on the wrong comparison. Under Illinois law, in a case of a void contract like this, the issue of *in pari delicto* calls for a comparison of the fault of the claimant to the fault of the party from whom restitution is sought, i.e., in this case Sun Life. The comparison is not between the claimant and non-party bad actors who designed and carried out the unlawful scheme. See, e.g., *Gamboa*, 407 Ill. App. 3d at 76, 941 N.E.2d at 1017 (restitution permissible where plaintiffs were not *in pari delicto* with defendants who misled plaintiffs into illegal contracts to obtain immigration benefits); *Ransburg*, 224 Ill. App. 3d at 686–87, 586 N.E.2d at 1298–99 (comparing fault of defendant unlicensed architect and plaintiff clients who paid him); see also *Davis*, 803 F.3d at 911 (citing *Gamboa* and *Ransburg*). There is no viable theory here under which Sun Life was at substantially greater fault than Vida in the deceptive scheme for an illegal wager. Since we did not apply this theory in *Davis*, however, but ordered a refund of premiums from an insurer to a genuinely innocent purchaser, we decline to rely on this ground for denying a refund of Vida's premiums here.

Even if we avoid comparing fault of (non-plaintiff) Vida and Sun Life and ask only whether Vida was an innocent buyer of the Corwell policy, Sun Life still prevails on its cross-appeal. Undisputed facts show that Vida was not the naïve innocent in this scheme. Vida is a multibillion-dollar company in the business of purchasing life insurance policies. Its representatives and attorneys conduct an in-depth due-diligence process before purchasing any insurance policy, including the Corwell policy. That process includes reviewing the policy, determining whether it was supported by an insurable interest, and figuring out the net worth of the policyholder. A Vida representative testified that Vida would give a policy a

"moderate" risk designation "if there might be questions about net worth or insurable interest." The representative also acknowledged that the use of non-recourse premium financing could raise a flag that the policy may be deemed stranger-originated life insurance or have insurable interest problems. Moreover, Vida as a matter of practice reduced the amount it was willing to pay for a policy if, like Corwell's policy, it had been funded by premium financing because of the risk that the policy would be challenged on insurable interest grounds. That automatic reduction could be lifted, however, if on further review Vida determined that the policy was less risky.

Vida applied this extensive review process to Corwell's policy before its purchase. It assigned Corwell's policy a "moderate" risk level. The Vida representative explained that Sun Life's litigiousness was a main factor in setting that risk level, but the due diligence records showed that "issue state" was also a factor. He clarified that the "issue state" designation was more reflective of the risks resulting from the litigiousness of Sun Life and the state it would sue in.

Also, despite being aware of the nationwide litigation related to Coventry's loan program of which Corwell's policy was a product, Vida said it had "felt comfortable with [Corwell's] net worth, how the policy was originated and the documentation that accompanied the file." That comfort though did not lead Vida to remove the automatic price reduction from Corwell's policy, indicating that even after further review it still thought the policy carried risks.

Even if we consider this evidence in the light most favorable to Wells Fargo and Vida, a reasonable jury could not treat Vida as an innocent purchaser. Vida's "comfort" with Corwell's policy reflects no more than a well-informed

calculation of risks and potential rewards. Vida walked into the transaction as a highly sophisticated buyer fully aware of all the material facts and the significant risk that Corwell's policy would be found unlawful and void. In addition to the red flags that came up during its own review process, Vida also knew about the successful suits in courts around the country challenging the validity of policies funded using the Coventry Capital loan program and that were later acquired by a Coventry entity. Vida was fully informed about Coventry's scheme and took a calculated risk to try to profit from it by purchasing Corwell's policy at a discount and then attempting to cash in at his death. Cf. *Davis*, 803 F.3d at 911–12 (affirming return of policy premiums that the last investor for the policy before the insured's death had paid because there was no evidence he knew the policy was void).

We AFFIRM judgment for Sun Life on Counts I and II of its complaint and all portions of Wells Fargo's counterclaims, and we REVERSE the district court's judgment for Wells Fargo on its unjust enrichment counterclaim (Count IV) as to the Vida premiums; Sun Life is entitled to summary judgment on that remaining portion of Wells Fargo's counterclaims.