IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GERONTA FUNDING, a Delaware Statutory Trust, | § § § | No. 380, 2021 |
| Defendant Below, Appellant, | § § § § | Court Below – Superior Court of the State of Delaware |
| v. | § § | C.A. No. N18C-04-028 |
| BRIGHTHOUSE LIFE INSURANCE COMPANY, | § § § | |
| Plaintiff Below, Appellee. | § § § | |

Submitted:     June 8, 2022
Decided:      August 25, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

Andrew S. Dupre, Esquire (*argued*), Steven P. Wood, Esquire, Travis J. Ferguson, Esquire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; *for Appellant Geronta Funding*.

Gregory F. Fischer, Esquire, COZEN O'CONNOR, Wilmington, Delaware; Joseph M. Kelleher, Esquire (*argued*), Brian D. Burack, Esquire, COZEN O'CONNOR, Philadelphia, Pennsylvania; *for Appellee Brighthouse Life Insurance Company*.

1

**MONTGOMERY-REEVES**, Justice:

This appeal requires the Court to determine whether premiums paid on insurance policies declared void *ab initio* for lack of an insurable interest should be returned. Geronta Funding ("Geronta" or "Appellee") argues that Delaware law requires the automatic return of all premiums paid on the void policy. Brighthouse Life Insurance Company ("Brighthouse" or "Appellant") argues that Delaware law does not require an automatic return of premiums; rather, a party must prove entitlement to restitution. The court below agreed with Brighthouse and relied on the Restatement (Second) of Contracts (the "Restatement") to determine whether Geronta was entitled to restitution. Specifically, the court held that Geronta may obtain restitution under Section 198 of the Restatement ("Section 198") if it could prove excusable ignorance or that it was not equally at fault. Applying this test, the court ruled that Geronta was only entitled to the return of the premiums it paid after alerting Brighthouse to the void nature of the policy at issue. Geronta appeals this ruling, arguing that the court erred when it adopted Section 198 instead of automatically returning the premiums, erred in its actual application of Section 198, even assuming that is the proper test, and erred by precluding certain testimony from Geronta witnesses.

Because this is a matter of first impression, the Court first surveys the applicable legal landscape, which reveals that courts across the country generally have adopted one of the following approaches: (1) rescission and automatic disgorgement of premiums, (2) restitution under a fault-based analysis grounded in considerations specific to insurance

2

policies declared void *ab initio* for lack of an insurable interest, and (3) restitution under the Restatement. This Court adopts restitution under a fault-based analysis as framed by the Restatement as the test to determine whether premiums should be returned when a party presents a viable legal theory, such as unjust enrichment, and seeks the return of paid premiums as a remedy. We hold, however, that despite applying the Restatement, the Superior Court's application of the Restatement failed to account for the relevant questions encompassed by that approach.

Having reviewed the parties' briefs and the record on appeal, and after oral argument, we reverse the court's holdings regarding entitlement to premiums and remand for consideration consistent with this Opinion. But we find no fault in the Superior Court preclusion of certain testimony from Geronta's witnesses. As such, the judgment of the Superior Court is AFFIRMED, in part, and REVERSED and REMANDED, in part.

## I. RELEVANT FACTS AND BACKGROUND

### A. The Seck Policy

On July 11, 2007, Mansour Seck Irrevocable Life Insurance Trust (the "Seck Trust") applied to MetLife Investors USA Insurance Company (Brighthouse's predecessor) for a $5 million universal life insurance policy insuring the life of a fictitious man identified as

Mansour Seck (the "Policy"), with a birthday of January 1, 1933.[1]  Seck was identified as a

French citizen residing at 170 Academy Street, Jersey City, New Jersey.[2]

Algren Associates, Inc. ("Algren"), a broker-general-agent organization with whom

MetLife had a longstanding relationship, conducted a recorded phone interview with

someone purporting to be Seck.[3]  In that interview, the individual claiming to be Seck stated

that he was a retired French ambassador with a yearly income of $500,000 from a pension

and $1.5 million from investments.[4]  He also claimed that his net worth was $18 to $20

million.[5]

Algren submitted the following information about Seck to MetLife: "'Marital Status:

married [;] Annual earned income: $400,000 [;] unearned income: $0 . . . The applicant is a

retired U[S] Ambassador to France.  He has diplomatic status[,] and his passport allows him

to come and go freely.  His passport # is 02Y12556479, exp. 10/20/12.'"[6]

Algren also submitted Seck's general medical information, such as a note from Seck's

physicians confirming that Seck regularly attended medical appointments.[7]  Algren provided

MetLife with two full paramedical exams from an approved third-party that showed Seck's

---

[1] Opening Br. Ex. B at 6-7 (hereinafter, "Ex. B at __").
[2] *Id.*
[3] *Id.* at 8.
[4] *Id.*
[5] *Id.*
[6] App. to the Opening Br. 558 (hereinafter "A__").
[7] Ex. B at 9.

medical history, vitals, and EKG readings.[8]  An approved third party represented that he personally took Seck's blood pressure, performed EKG readings, and witnessed Seck sign the application's medical section.[9]  "Based on the paramedic's reports, MetLife waived its requirement to have Mansour Seck undergo a 'MD Exam + EKG,' which was defined in MetLife's 'The Life Underwriting Guide' as a 'full exam performed by a medical doctor.'"[10] MetLife also received a lab slip for Seck's lab work that included test results for blood and urine.[11]  MetLife reviewed Algren's cover letter regarding the results of the test results.[12]

If documentation relating to a policy comes from a general agent with whom MetLife has an existing relationship, MetLife itself does not further validate the documentation or employ a third party to validate the documentation.[13]

Sandor Krauss, the trustee of the Seck Trust, executed a trust certificate in which the named beneficiary of the Seck Trust was Michael Seck, with an address of 170 Academy Street, Suite B23, Jersey City, New Jersey.[14]  Krauss also confirmed the soundness and validity of the Policy.[15]  Krauss is a licensed attorney in the State of New York.[16]  He acknowledged and agreed in the Policy application's trust certification that MetLife "is

---

[8] *Id.*
[9] *Id.*
[10] *Id.* at 9-10.
[11] A564; Ex. B at 10.
[12] *Id.*
[13] Ex. B at 34-35.
[14] *Id.* at 7; Answering Br. 6.
[15] Ex. B at 10.
[16] *Id.*

relying exclusively on the representations in this agreement . . . . [MetLife] is permitted to rely upon the representations in this document, unless or until notice of any change, amendment, or revocation is provided in writing and delivered to [MetLife]."[17] He also declared in the Statement of Policyowner Intent Form that the Seck Trust did not "intend to sell the applied-for life insurance policy in the future."[18] He later testified that he had never met or communicated with anyone by the name of Mansour Seck.[19]

Talma Nassim, a licensed broker working with Algren, submitted the application for the Policy, acted as witness to Seck's signature, and confirmed that she met Seck in person.[20] She certified that she spoke with Seck personally and witnessed his signature on the application.[21] MetLife had a policy of relying on the broker's representations, particularly where, as here, MetLife had an established relationship with the general agent.[22]

After confirming that its procedures and guidelines were met, MetLife issued the Policy on or around July 24, 2007.[23]

---

[17] A560.

[18] A561.

[19] Ex. B at 11 n.30.

[20] A556-57; Ex. B at 12.

[21] Ex. B at 12.

[22] *Id*. at 35.

[23] *Id*. at 12.

6

For the next two years, the Seck Trust paid $248,711.14 in premiums.[24] After the two-year contestability period ended, the Seck Trust sold the Policy to EEA Life Settlements, Inc..[25] Before purchasing the policy, EEA Life Settlements, Inc. consulted with its investment advisor, ViaSource Funding LLC ("ViaSource).[26] ViaSource is "in the business of locating, evaluating, investing in, purchasing, servicing, managing, dealing in and collecting upon Life Insurance Policies."[27] Although ViaSource did its own "check of the validity of [Seck],"[28] EEA Life Settlements, Inc. did not hire a private investigator to locate Seck.[29] EEA Master Fund, LTD ("EEA") bought the Policy on August 11, 2009, and paid premiums on the Policy for the next six years.[30]

On January 25, 2010, ViaSource tried to contact Krauss and Seck's designated contacts for Seck's contact information.[31] Krauss stated that he did not have a valid address for Seck and was unable to provide any of Seck's information.[32] Mail sent to Seck was marked "return to sender," and three of the doctors from his application stated that Seck was

---

[24] *Id.* at 13; A565.
[25] A565.
[26] A566.
[27] *Id.*
[28] A1649. ViaSource confirmed Seck's validity by getting "verification coverage . . . from the carrier confirming the policy was enforce [sic], confirming its issue date, confirming the insured's name and address, owner's name and address, issue date, policy face amount, cash value, if there was any." *Id.*
[29] A566.
[30] Ex. B at 14.
[31] A572.
[32] *Id.*

7

not their patient.[33]  On October 19, 2010, ViaSource reached out to Krauss again, and he was still unable to provide ViaSource with any information.[34]  As a result, ViaSource and EEA placed the Policy on its "Hard to Track" list.[35]  They did not, however, regard the issue as a red flag.[36]

On October 11, 2011, ViaSource ran a public records search for Seck, which resulted in no findings of any public record for a Mansour Seck with a birthday of January 1, 1933, or with a matching Social Security number.[37]  ViaSource conducted a second search in 2012 that again turned up no matching results.[38]

On December 17, 2012, ViaSource sent a letter to one of Seck's designated contacts, with a reminder that he agreed to "'[p]rovide updates to as [sic] Mr. Seck's location once every one and a half [sic] months [;] [p]rovide the Insured's updated medical records, every six months [;] [p]rovide immediate written notification if Mr. Seck leaves the country . . . .'"[39]  The letter further stated, "'[t]o date, you have not fulfilled any of your obligations.  You are in breach of this agreement . . . .'"[40]  EEA, however, continued paying $706,478.29 in premiums on the Policy to MetLife until it sold the Policy to Geronta in 2015.[41]

---

[33] *Id.*
[34] A578-79.
[35] A579.
[36] Ex. B at 22.
[37] A579.
[38] A581.
[39] A581-82.
[40] *Id.*
[41] A582.

8

On September 2, 2015, EEA sold the Policy to Geronta as part of a bulk sale of life insurance policies.[42] As part of the transaction, EEA created a data room with information about all the policies being sold.[43] Geronta did not ask for additional information.[44] Geronta did not review the information in the data room about the Policy, and it did not conduct any independent research before purchasing the Policy, other than obtaining confirmation from MetLife that the Policy was active.[45] It also did not perform a public records search on Seck or the Seck Trust.[46] Furthermore, "Geronta did not try to confirm whether insureds had already died prior to purchasing portfolios because if the seller became aware of this, the seller might remove that policy from the portfolio thereby depriving a purchaser . . . from collecting the death benefit (without paying any premiums on the policy)."[47] According to Geronta, "the standard in the tertiary market is not to check before closing because if the buyer finds a dead person they want to keep the windfall from the death benefits."[48]

Geronta executed a purchase and sale agreement with EEA Life Settlements, Inc. on September 2, 2015 (the "Agreement").[49] Neither MetLife nor Brighthouse, MetLife's

---

[42] *Id.*
[43] A584.
[44] Ex. B at 14.
[45] A584-85.
[46] A584.
[47] Ex. B at 46.
[48] *Id.*
[49] A583.

9

successor, are parties to the Agreement.[50]  In the Agreement, Geronta represented that, either alone or with its advisors, it had,

> such knowledge and experience both in financial, business and tax matters generally, and relating to the acquisition of in-force life insurance policies specifically, to enable it to identify, understand and independently evaluate the merits and risks of the purchase of the Policies and other Conveyed Property, the terms and conditions of this Agreement and each of the other Transaction Documents and the entry into and consummation of the transactions contemplated hereby and thereby.[51]

Geronta also stated that it "had the opportunity to conduct its own independent investigation of the Policies and the Conveyed Property."[52]

In 2016, Geronta attempted to update its records regarding the Policy, but was unable to find current information about Seck, leading to suspicions about the validity of the Policy.[53]  Geronta subsequently contacted EEA, which hired a private investigator and ultimately concluded that Seck was a real person that was "locatable."[54]  Geronta doubted these findings in part because the information EEA provided about a person named Mansour Seck did not match the information about Seck provided in the Policy.[55]  Thus, Geronta hired its own private investigator and discovered that Seck was fictitious.[56]

---

[50] *Id.*

[51] A583-84.

[52] A584.

[53] Ex. B at 14.

[54] *Id.* at 14-15

[55] *Id.* at 15.

[56] A588.

10

Geronta reached out to Brighthouse, MetLife's successor, about its suspicions.[57] But Geronta continued to pay premiums on the Policy. Geronta eventually demanded that Brighthouse refund all the premiums paid on the Policy; Brighthouse denied that request.[58]

## B.    MetLife's Activities After Issuing the Policy

In 2009, two years after MetLife issued the Policy, the Seck Trust beneficiary, Pape Seck, applied to serve as an agent for three MetLife life insurance applications, all of which were unrelated to the Policy.[59] As a result, MetLife performed a public records search and found that Pape Seck had multiple aliases, including Pape M. Seck, Pape Seck, and Michael Seck (collectively, "Pape Seck").[60] The public records search also showed that Pape Seck was possibly related to someone named Mansour Seck and that, between July 2007 and October 2009, the previous and non-verified address for the possible relative named Mansour Seck was 170 Academy Street, B23, Jersey City, New Jersey.[61] The search also stated that the median household income for this neighborhood was $32,625.[62] As a result, MetLife denied Pape Seck's broker application and refused to issue any policies connected with his application.[63]

---

[57] Ex. B at 15.
[58] *Id.*
[59] A567; Ex. B at 16.
[60] A567; Ex. B at 16-17.
[61] A568.
[62] *Id.*
[63] *Id.*

11

A MetLife Regional Sales Vice President informed Pape Seck's general agent on or around December 8, 2009 that the applications were denied due to "IOLI[64] flags and financial irregularities."[65] The Regional Sales Vice President later emailed MetLife's Corporate Ethics Department to notify it that Pape Seck's general agent was surprised that his application had been denied.[66] The Corporate Ethics Department then emailed Jean Philipp, a Senior Fraud Investigator in MetLife's Ethics and Compliance Department who had performed the investigation into Pape Seck's application, and sought advice or guidance to give the Regional Sales Vice President.[67] Philipp's responded that the denial of the applications were based on several anomalies:

> I think you can share the following information with [the general agent[ [sic] with the understanding [the general agent] can use the information internally to determine whether her organization wishes to maintain a relationship with this broker . . . [t]he lack of real estate ownership certainly brings into question the net worth figures provided . . . [a]s to medical info: all three insureds completed an[] EKG and blood draw on the same day the app was signed and within 30 minutes of each other. Further, all three insureds completed the paramed examination on the same day[;] . . . [o]ur underwriters also noted wide variation in blood pressure reading on one insured when comparing EKG exam (10/28/09) with the paramed exam (11/05/09)[;] . . . I have tried to contact Mr. [Pape] Seck to discuss these cases but the "business telephone" he provided on our application to contact is a cell that does not accept voice messages[;] [w]e have enough disconnects with these cases that our Underwriting area felt we

---

[64] The acronym IOLI stands for "investor-owned life insurance."
[65] A568.
[66] A569.
[67] *Id.*

12

could not ever get comfortable with the application information.[68]

"On December 17, 2009, David Bishop[, a Brighthouse internal investigator,] sent an email to Jean Philipp stating: 'Just received two wire transfers to review that have strong IOLI flags.' One of the wire transfers related to the Policy, noting that 'Ownership changed 7/09 to EEA Life Settlements, Inc. (just after the incontestability period expired)' and that the writing agent was Talma Nassim, through Algren Brokerage."[69]

MetLife did not inform EEA or Geronta that the Policy had strong IOLI flags.[70]

### C.     Pape Seck's Arrest and Prosecution

In 2010, Pape Seck was the subject of numerous press releases issued by the State of New Jersey and other insurance industry publications; they stated that Pape Michael Seck, a New York City insurance agent, had been arrested and prosecuted for fraudulent insurance schemes.[71]

The New Jersey Attorney General's office issued a press release on April 13, 2010, stating, "On April 12, 2010, Pape Seck pleaded guilty to two counts of insurance fraud in connection with his submissions, as an agent, between May 22, 2008 and July 27, 2009, of fraudulent life insurance applications to Prudential Life Insurance Company and Aviva Life

---

[68] A569-70.
[69] A571.
[70] *Id.*
[71] Ex. B at 24.

Insurance Company."[72] The insured's name on these applications was Mansour Seck.[73] The press release also stated that

> [B]etween May 22, 2008 and July 27, 2009, [Pape Seck] *submitted false applications*…for life insurance policies on behalf of Mansour Seck, listing Pape Seck as Mansour Seck's son and the beneficiary under the policies. *[Pape Seck] admitted that his father, whose name is Mansour Seck, did not apply for the life insurance*, nor did anyone by that name.
>
> Although Mansour Seck is the name of [Pape Seck's] father, [Pape Seck], in filing the applications, also used identifying information, including a Social Security Number, from two other real people named Mansour Seck, one a retired dignitary from Senegal in Africa and the other a New Jersey resident. Mansour Seck is a common name in the country of Senegal.[74]

This press release was posted on the New Jersey Attorney General's website.[75]

Moreover, Pape Seck's convictions were published in two online articles, both of which are publicly available.[76]

On April 26, 2010, New Jersey's Office of the Insurance Fraud Prosecutor subpoenaed MetLife's records concerning Seck, and in response, MetLife produced 169 pages of documents.[77]

---

[72] A573.
[73] *Id.*
[74] A573-74; Ex. B at 25.
[75] A574.
[76] A574-75.
[77] A575; Ex. B at 26.

On June 8, 2010, the New Jersey Attorney General issued a second press release in which it stated that Pape Seck was sentenced to three years in prison on June 7, 2010, for fraudulent insurance applications.[78] Several other publications published articles about Pape's conviction and sentencing on or around June 9, 2010.[79] All articles are either publicly available or behind paywalls.[80]

On October 17, 2011, the New Jersey Attorney General released a third press release about Pape Seck, stating that Pape Seck pleaded guilty to one count of insurance fraud and two counts of theft by deception.[81] It also announced that Pape Seck admitted that he knowingly made fraudulent or misleading statements between November 12, 2006, and June 4, 2008, in support of seven life insurance policy applications, one of which was the Policy.[82] The press release thanked MetLife "for [its] assistance in the investigation."[83] This press release was posted to the New Jersey Attorney General's website and was publicly available.[84]

On October 26, 2011, Jim McCarthy, an investigator with MetLife's Claims Investigation Unit emailed MetLife's Field Investigation Unit for Corporate Ethics and

---

[78] A575-76.
[79] A577-78.
[80] *Id.*
[81] A580.
[82] *Id.*
[83] *Id.*
[84] *Id.*

15

Compliance to make them aware of Pape Seck's conviction (the "McCarthy Email").[85] The email's subject line contained the name Mansour Seck, the Policy's policy number, Pape Seck's name, and the MetLife broker number.[86] The email noted that Pape Seck was recently sentenced for insurance fraud involving Seck and stated that MetLife cooperated with the authorities.[87]

### D. Litigation and the Superior Court Ruling

On April 4, 2018, Brighthouse filed suit, seeking a judicial declaration that the Policy was void *ab initio* for lack of an insurable interest and arguing that it is entitled to keep all the premiums paid on the Policy.[88] Geronta filed an answer, agreeing that the Policy was void *ab initio*,[89] and a counterclaim, alleging that it was entitled to reimbursement of all premiums paid, with the exception of the premiums paid by the original owner of the Policy.[90]

In late 2018, both parties filed motions for judgment on the pleadings.[91] Brighthouse argued that the Superior Court should leave the parties where it found them, while Geronta argued that it should receive all the premiums paid under rescission and disgorgement.[92] In

---

[85] A3034.
[86] *Id.*
[87] *Id.*
[88] A590.
[89] *Id.*
[90] Opening Br. Ex. A at 3 (hereinafter, "Ex. A at __").
[91] *Id.* at 3.
[92] *Id.* at 4-8.

16

its opinion, the court declared the Policy void *ab initio*.[93] The court denied Geronta's request for rescission and disgorgement, holding that rescission is not available where a contract is void because there is no contract to "unmake."[94] But the Superior Court also denied Brighthouse's request, noting that Geronta might be entitled to restitution.[95] Thereafter, the parties conducted discovery in preparation for trial.

The court conducted a bench trial in March 2021. After trial, the Superior Court ruled that Geronta was only entitled to restitution of the premiums it paid after it informed Brighthouse that the Policy was void for lack of an insurable interest.[96] In reaching that conclusion, the court applied Section 198 of the Restatement.[97] Under the Restatement, a party is entitled to restitution if it was excusably ignorant under Section 198(a) or not *in pari delicto* with the other party under Section 198(b).[98] As such, the Superior Court determined that "[i]n order for Geronta to prevail, the Court must find that Geronta was either excusably ignorant under §198(a); or not *in pari delicto* with Brighthouse under §198(b)."[99]

The Superior Court first concluded that Geronta was not entitled to restitution under Section 198(a) because it was not excusably ignorant of the fact that the Policy was void as

---

[93] Ex. A at 4-5.
[94] *Id.* at 5.
[95] *Id.* at 7-8.
[96] Ex. B at 63-66.
[97] *Id.* at 51-63.
[98] Restatement (Second) of Contracts § 198 (Am. L. Inst. 1981).
[99] Ex. B at 51.

17

against public policy.[100] The court found that Geronta intentionally and strategically refused to investigate or verify whether the insureds on the policies they purchased were alive until after it purchased the policies.[101] Moreover, the court found that "[h]ad Geronta done its research, it would have seen circumstances that it might have considered problematic" because "[t]he information, which Geronta insists was important, was easily obtainable or publicly available."[102] Here, the court pointed to the fact that (1) the EEA data room contained information about EEA's inability to verify any information about Mansour Seck or contact Mansour Seck;[103] and (2) "[p]ublic records searches would have shown multiple press releases and articles regarding Pape Seck's insurance fraud arrests and convictions; repeated references to the name 'Mansour Seck' in press releases; and MetLife's connection to the New Jersey investigation."[104] The court also found that Geronta failed on this prong of Section 198 because it was unable to show that MetLife's underwriting process was inappropriate or lacked good faith.[105] As such, the Superior Court held that Geronta was not inexcusably ignorant.

Next, the Superior Court concluded that Geronta failed to show that it was not *in pari delicto* with Brighthouse or that it was the victim of misrepresentation or oppression by

---

[100] *Id.* at 51-56.
[101] *Id.* at 53-54.
[102] *Id.* at 54.
[103] *Id.* at 54-55.
[104] *Id.* at 55.
[105] *Id.* at 55-56.

18

Brighthouse.[106]  In conducting an *in pari delicto* analysis, the court looked at the diligence of both parties, finding that "[t]he evidence shows that MetLife/Brighthouse followed its guidelines and practices before issuing the Seck Policy whereas Geronta's investigation was superficial."[107]  The court also found that Geronta failed to prove that Brighthouse knew that the Policy lacked an insurable interest even after MetLife/Brighthouse learned of issues with Pape Seck.[108]  Additionally, after noting that the Restatement's comments allow for restitution if the party showed that it was the victim of misrepresentation or oppression practiced on it by the other party, the court found that Geronta did not satisfy this requirement because Brighthouse did not commit fraud on Geronta by not disclosing inconsistencies with the Policy since those inconsistencies were publicly available or in the data room.[109]  Thus, the Superior Court concluded that Geronta did not satisfy Section 198(b) of the Restatement and denied Geronta's request for the return of premiums paid before it made Brighthouse aware that Seck was fictitious.

## II.   STANDARD OF REVIEW

This Court reviews questions of law de novo.[110]  "We will uphold the Superior Court judge's factual findings unless they are clearly erroneous and the record does not support

---

[106] *Id.* at 56-62.
[107] *Id.* at 58.
[108] *Id.* at 61.
[109] *Id.* at 61-63.
[110] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 94 (Del. 2021).

them."[111] "Factual findings are not clearly erroneous 'if they are "sufficiently supported by the record and are the product of an orderly and logical deductive process."'"[112] "We will not set aside a trial court's factual findings 'unless they are clearly wrong and the doing of justice requires their overturn.'"[113]

"A decision whether to admit testimony as relevant is within the sound discretion of the trial judge and will not be reversed absent a clear abuse of discretion."[114] "When an act of judicial discretion is under review the reviewing court may not substitute its own notions of what is right for those of the trial judge, if his judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[115]

## III.   ANALYSIS

This case requires us to answer the following question: What is the appropriate approach when analyzing whether to return premiums paid on an insurance policy that is void *ab initio* as against public policy for lack of an insurable interest?

Geronta contends that, under case law from the District of Delaware, insurance policies that are void *ab initio* as against public policy must be rescinded.[116] According to

---

[111] *Lawson v. State*, 72 A.3d 84, 88 (Del. 2013) (citing *Key Props. Grp., LLC v. City of Milford*, 995 A.2d 147, 150 (Del. 2010)).

[112] *Bäcker*, 246 A.3d at 94-95 (quoting *Biolase, Inc. v. Oracle Partners, L.P.*, 97 A.3d 1029, 1035 (Del. 2014)).

[113] *DV Realty Advisors LLC v. Policeman's Annuity and Benefit Fund of Chi.*, 75 A.3d 101, 108 (Del. 2013) (quoting *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 219 (Del. 2005)).

[114] *Tyree v. State*, 510 A.2d 222, 1986 WL 16037, at *1 (Del. May 29, 1986) (ORDER).

[115] *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968).

[116] Opening Br. 16-17.

20

Geronta, the effect of such rescission is the automatic return of the premiums to the payor in order to return parties to the status quo.[117] Geronta avers that public policy supports its position because, "[i]f an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk."[118] Thus, Geronta argues, the Superior Court erred in refusing to rescind the policy and return all premiums to Geronta.[119]

In the alternative, Geronta next argues that if restitution is the correct remedy, the court still erred in not returning the premiums.[120] Geronta argues that the Superior Court failed to apply the disproportionate forfeiture exception under Section 197 of the Restatement, incorrectly applied Section 198 of the Restatement by failing to address comparative fault between the parties and ignoring conclusive evidence that Brighthouse had actual knowledge that the Policy was void in 2011, and erred by failing to address its bona fide-purchaser-for-value defense.[121] Finally, Geronta argues that the Superior Court erred by precluding Geronta's witnesses from testifying about their understanding of customary due diligence in the tertiary market.[122]

---

[117] *Id.* at 23.
[118] *Id.* at 22 (citing *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546 at 565).
[119] *Id.* at 17.
[120] *Id.* at 25-42.
[121] *Id.*
[122] *Id.* 43-45.

Brighthouse responds that the Superior Court properly denied Geronta's request because parties to agreements void *ab initio* as against public policy typically are not entitled to relief, including rescission; instead, courts leave the parties where they find them.[123] Brighthouse argues that the exception to this rule is found in Section 198, which permits restitution of contracts void *ab initio* as against public policy in two specific circumstances.[124] Brighthouse argues that neither of those exceptions applies to Geronta.

Brighthouse also responds that the Superior Court performed an analysis of the comparative fault of the parties and correctly concluded that Geronta was more at fault than Brighthouse.[125] Moreover, Brighthouse argues that the Superior Court correctly found that Brighthouse did not have actual knowledge that the Policy lacked an insurable interest because the evidence Geronta relies on would have required the Superior Court to make numerous baseless inferences to reach Geronta's preferred conclusion.[126]

Finally, regarding Geronta's witness testimony, Brighthouse argues that the Superior Court did not abuse its discretion by precluding witnesses from testifying about their understanding of standard diligence in the tertiary market because Geronta refused to allow deposition testimony about the very same topic during discovery.[127]

We address each argument in turn.

---

[123] Answering Br. 18-20.
[124] *Id.* at 19-20.
[125] *Id.* at 34-35.
[126] *Id.* at 29.
[127] *Id.* at 41-43.

## A. Overview of Potential Remedies for an Insurance Policy That Is Void *Ab Initio* for Lack of an Insurable Interest

"A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end."[128] "For hundreds of years, the law has prohibited wagering on human life through the use of life insurance that was not linked to a demonstrated economic risk."[129]

In *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust ex rel. Christiana Bank & Tr. Co.*, the Court addressed, for the first time, whether the validity of a life insurance policy lacking an insurable interest could be challenged after the expiration of the two-year contestability period.[130] In answering that question in the affirmative, the Court concluded that "[u]nder Delaware common law, if a life insurance policy lacks an insurable interest at inception, it is void *ab initio* because it violates Delaware's clear public policy against wagering."[131] "Consequently, the Court held that STOLI policies are *void ab initio* and 'a fraud on the court,' meaning that they never legally come into existence . . . ."[132]

Under Delaware law, "it is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law. Ordinarily, we think, when such is the fact,

---

[128] *Grigsby v. Russell*, 222 U.S. 149, 154 (1911).

[129] *Lavastone Cap. LLC v. Est. of Berland*, 266 A.3d 964, 967-68 (Del. 2022).

[130] 28 A.3d 1059 (Del. 2011).

[131] *Id.* at 1067-68.

[132] *Wells Fargo Bank, N.A. v. Est. of Malkin*, __ A.3d __, 2022 WL 1671966, at *4 (Del. May 26, 2022).

neither party has a remedy to any extent against the other."[133]  Moreover, this Court has held that "[a] court may never enforce agreements void *ab initio*, no matter what the intentions of the parties."[134]  Thus, when an agreement is void *ab initio* as against public policy, the courts typically will not enforce a remedy to any extent against either party.  In other words, the courts typically will leave the parties where they find them.

This Court has not yet announced the proper test under Delaware law for determining whether premiums paid on an insurance policy that is void *ab initio* as against public policy for lack of an insurable interest should be returned to the payor or retained by the insurer.  A survey of case law across the country reveals three potential answers to this question: (1) rescission of the policy and the automatic return of the premiums, (2) restitution under a fault-based analysis grounded in considerations specific to insurance policies declared void *ab initio* for lack of an insurable interest, and (3) restitution under the Restatement (Second) of Contracts.[135]

---

[133] *Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965).

[134] *Price Dawe*, 28 A.3d at 1067.

[135] We acknowledge that the vast majority of cases addressing this issue arise in the STOLI ("stranger-originated life insurance") context, where a stranger without an insurable interest buys insurance—essentially making a wager—on another person's life.  However, when analyzing whether to return premiums, we see no reason to distinguish between a STOLI case and a case involving a lack of an insurable interest because the insured is fictitious.  The parties appear to agree.  They have cited many of the STOLI cases discussed in this opinion in arguing for their preferred outcome.  And they do not argue that there is any reason to analyze this case differently from STOLI cases.

24

### a.      Rescission

Rescission is a contractual remedy that can be sought at law or in equity.[136]  Generally, "rescission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo."[137]  "While rescission at law refers to the 'judicial declaration that a contract is invalid and a judicial award of money or property,' equitable rescission offers a platform to provide additional equitable relief, such as cancellation of a valid instrument— the formal annulment or setting aside of an instrument or obligation."[138]  Thus, rescission would result in the return of any premiums paid.

Three main decisions from the United States District Court for the District of Delaware have granted the insurer's request for rescission of void stranger-originated life insurance ("STOLI") policies and required the return of the premiums from the insurer to the investor.  These three cases—*Sun Life Assurance Co. v. Berck*,[139] *Lincoln National Life Insurance Co. v. Snyder*,[140] and *Principal Life Insurance Co. v. Lawrence Rucker 2007 Insurance Trust*[141]—were all decided before this Court's decision in *PHL*

---

[136] *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *21 (Del. Ch. Mar. 21, 2018).
[137] *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982); *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984).
[138] *Ravenswood*, 2018 WL 1410860, at *21 (citing *E.I. Du Pont De Nemours & Co. v. HEM Rsch., Inc.*, 1989 WL 122053, at *3 (Del. Ch. Oct. 13, 1989).
[139] 719 F. Supp. 2d 410 (D. Del. 2010).
[140] 722 F. Supp. 2d 546 (D. Del. 2010).
[141] 774 F. Supp. 2d 674 (D. Del. 2011).

*Variable Insurance Co. v. Price Dawe 2006 Insurance Trust ex rel. Christiana Bank & Tr. Co.*

In *Berck*, the insurer, Sun Life Assurance Company, sought a declaratory judgment that the insurance policy at issue, which lacked an insurable interest, was void *ab initio*.[142]  It also sought to retain of some or all of the premiums paid on the policy.[143]  There, on a motion to dismiss, the court accepted as true the allegations that the defendants fraudulently procured the illegal policy: "Beginning in April 2007, Lockwood, defendant, and others helped Berman, who was 77 years old at the time, apply for a life insurance policy.  They allegedly sought the policy not for any legitimate insurance need but as a wagering contract to sell to stranger investors on the secondary life insurance market."[144]

In determining whether the insurer could retain the premiums, the District Court noted, in relevant part, that "rescission of benefit increases on a life insurance policy requires the insurer to refund premiums."[145]  The court then noted that "rescission is an equity claim that requires all parties to be returned to the status quo."[146]  Finally, the court determined that "if an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable

---

[142] *Berck*, 719 F. Supp. 2d at 411.
[143] *Id.*
[144] *Id.* at 411-12.
[145] *Id.* at 418.
[146] *Id.*

effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk."[147]  As such, the court held that the insurer could not seek both rescission of the agreement and retention of the premiums, despite the fact that it accepted that the defendant procured the void policy.  Thus, the court "dismiss[ed] plaintiff's claim seeking retainment of premiums in light of the fact that it also seeks to rescind the [policy]. In an equitable action such as this, plaintiff may not have it both ways."[148]

Similarly, in *Snyder*, the District Court considered whether to allow an insurer to retain premiums on a STOLI policy.[149]  Again, on a motion to dismiss, the court accepted as true the allegation that the policy was wrongly procured by the defendants who "sought the policy not for any legitimate insurance need, but as a wagering contract to sell to stranger investors on the secondary life insurance market."[150]  The plaintiff, Lincoln National Life Insurance Company, sought a declaratory judgment that the policy was either void or voidable and sought to retain some or all of the premiums paid under the policy.[151]  In response, the defendant argued that "plaintiff cannot maintain its action for rescission because it chose to

---

[147] *Id.* at 418-19.
[148] *Id.* at 419.
[149] *Snyder*, 722 F. Supp. 2d at 550.
[150] *Id.*
[151] *Id.*

retain premiums even after obtaining [k]nowledge of the alleged STOLI scheme."[152]

As in *Berck*, the court ruled that "rescission of benefit increases on a life insurance policy requires the insurer to refund premiums."[153] Thus, the court ordered that, in the event of rescission, the insurer could not retain premiums on the policy, regardless of whether the defendant procured the void policy.[154]

The court reached the same result on a motion for summary judgment in *Rucker*. In that case, Principal Life Insurance ("Principal") sought a declaration from the District Court that one of its policies was a STOLI policy that was void *ab initio* or voidable due to a lack of an insurable interest at the policy's inception.[155] Principal also sought to retain some or all of the premiums paid on the policy.[156] The District Court examined both *Berck*'s and *Snyder*'s holdings that an insurer could not both rescind a policy and retain the premiums on that policy.[157] Therefore, it ordered that Principal could not retain any premiums paid on the policy.[158]

In addition to the three District of Delaware cases identified above, two other district courts, applying Delaware law, have followed the District of Delaware cases.

---

[152] *Id.* at 557.
[153] *Id.* at 564.
[154] *Id.* at 566.
[155] *Rucker*, 774 F. Supp. 2d at 677.
[156] *Id.*
[157] *Id.* at 680-83.
[158] *Id.*

In *U.S. Bank National Ass'n v. Sun Life Assurance Co. of Canada*, U.S. Bank owned a $10 million life insurance policy issued by Sun Life.[159] Sun Life asserted that the policy was an impermissible STOLI policy and sought a declaration that the policy was void *ab initio*.[160] After determining that there was no insurable interest at the inception of the policy, the Eastern District of New York relied on *Berck* and returned the premiums paid on the policy to U.S. Bank.

The Southern District of Florida took a similar approach in *Sun Life Assurance Co. of Canada v. U.S. Bank National Ass'n*.[161] First, the court noted that under Florida law, "'[w]here a party wrongfully procures a life insurance policy on an individual in whom it has no insurable interest, the party is not entitled to a return of premiums paid for the void policy.'"[162] But because the court was applying Delaware law, it held that, under *Berck*, a person who procures a void policy could receive a refund of its premiums despite its actions.[163] As such, the court returned the premiums.[164]

In all five cases, the court required the return of the premiums to the investor and noted that allowing an insurance company to challenge the enforceability of a policy while retaining the premiums "would have the undesirable effect of incentivizing insurance

---

[159] 2016 WL 8116141, at *6 (E.D.N.Y. Aug. 30, 2016).
[160] *Id.* at *8.
[161] 2016 WL 161598, at *1, *18 (S.D. Fla. Jan. 14, 2016).
[162] *Id.* (citing *TTSI Irrevocable Tr. v. ReliaStar Life Ins. Co.*, 60 So. 3d 1148, 1150-51 (Fla. 5th DCA 2011)).
[163] *Id.*
[164] *Id.*

companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk."[165]  Thus, these cases stand for the proposition that an insurer cannot seek both rescission of the policy and retention of the policy's premiums.[166]  In other words, the rescinding party must restore everything of value it has received under the contract from the other party.

### b.    Restitution

Restitution is "[a] body of substantive law in which liability is based not on tort or contract but on the defendant's unjust enrichment."[167]  It is "[t]he set of remedies associated with that body of law, in which the measure of recovery is usu[ally] based not on the plaintiff's loss, but on the defendant's gain."[168]

In the relevant case law, restitution has been awarded under two separate approaches: (1) a fault-based analysis grounded in considerations specific to insurance policies declared void *ab initio* for lack of an insurable interest and (2) the Restatement.

---

[165] *Snyder*, 722 F. Supp. 2d at 565.

[166] *See PHL Variable Ins. Co. v. Chong Son Pak Life Ins. Tr.*, 2012 WL 13201401, at *1 (D. Del. July 25, 2012) (holding that the insurance company is not permitted to keep the premiums on a policy that is declared void *ab initio* for lack of an insurable interest at inception); *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 379 (1st Cir. 1991) (noting that the general rule is that "when an insurer ventures to rescind a policy on the basis of a material misrepresentation in the application, it must first tender to the insured the premiums paid under the policy").

[167] Restitution, Black's Law Dictionary (11th ed. 2019).

[168] *Id.*

### i. Restitution under a fault-based analysis grounded in considerations specific to insurance policies declared void *ab initio* for lack of an insurable interest

The majority of courts considering this issue have adopted a fault-based analysis in determining whether to return premiums paid on an illegal or void insurance policy. This approach appears to find its roots in the doctrine of *in pari delicto. In pari delicto*, "Latin for 'in equal fault,' . . . is a general rule that courts 'will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own act has placed them.'"[169] "The general rule of in pari delicto, however, does not apply in certain discrete circumstances. For example, if . . . the parties are not considered to be in truly equal fault."[170] This *in pari delicto* exception is further supported by Williston, which states that "illegal bargains may be enforced, at least to some extent, under certain circumstances . . . . Accordingly, there are exceptions to the general rule that an executed transfer cannot be set aside . . . ."[171] One such exception applies when "parties not *in pari*

---

[169] *In re Am. Intern. Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009) (quoting *In re LJM2 Co–Investment, L.P.*, 866 A.2d 762, 775 (Del. Ch. 2004)); *see also Burns v. Ferro*, 1991 WL 53834, at *2 (Del. Super. Ct. Mar. 28, 1991) ("Furthermore, it is well-settled law that a court will not aid a contractual claim founded on a violation of the law. Where parties to a contract are *in pari delicto*, a court will 'leave them where it finds them,' and will refuse to enforce the contract."); *Morford v. Bellanca Aircraft Corp.*, 67 A.2d 542, 547 (Del. Super. Ct. Apr. 27, 1949) ("The authorities are practically unanimous in saying that, where parties are in pari delicto, a Court will leave them where it finds them. Money paid upon an illegal agreement may not be recovered.").
[170] *In re Am. Intern. Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 883 (Del. Ch. 2009).
[171] Williston on Contracts § 19:76 (4th ed. 2022); *see also* Am. Jur. 2d Equity § 24.

*delicto*."[172] As such, under the doctrine of *in pari delicto*, a court may return consideration paid toward an illegal contract when the parties are not equally at fault.[173]

Numerous courts have utilized some form of this doctrine to determine whether to return premiums as restitution damages under a theory of unjust enrichment when an insurance policy is declared void or illegal. For example, in *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, the United States Court of Appeals for the Third Circuit certified to the New Jersey Supreme Court the question whether a downstream purchaser of a STOLI policy is entitled to a refund of any premium payments it made on the illegal policy.[174] After reviewing case law from various jurisdictions, the New Jersey Supreme Court adopted a "fact-sensitive approach" under which "trial courts should develop a record and balance the relevant equitable factors," including "a party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags."[175]

In *Sun Life Assurance Co. of Canada v. Conestoga Trust Services, LLC*, the defendant asked the District Court for the Eastern District of Tennessee to return all the premiums it paid for an illegal STOLI policy.[176] The District Court noted that it followed the "majority rule" that "an assignee who has paid premiums *in good faith* is entitled to recover premiums

---

[172] Williston on Contracts § 19:76 (4th ed. 2022) ("Where the parties appear not to have been in pari delicto, however, the one whose wrong is less than that of the other may be granted relief. The doctrine is often applied as between the parties to a fraudulent or illegal transaction.").

[173] Williston on Contracts § 19:76, 19:80 (4th ed. 2022).

[174] 208 A.3d 839, 841 (2019).

[175] *Id.* at 859.

[176] 263 F. Supp. 3d 695, 704 (E.D. Tenn. 2017), *aff'd*, 717 F. App'x 600 (6th Cir. 2018).

paid if the policy is later declared void because of the misconduct of others."[177] It then noted that the defendant was entitled to the return of the premiums because it "is not to blame for the fraud here; it merely acquired a life insurance policy from a predecessor assignee and that policy turned out to be void."[178] Moreover, the court found that allowing the insurer to retain the premiums would be a windfall.[179] Thus, the court determined that the third-party investor was entitled to the premiums because it was not at fault for the fraudulent STOLI policy.

In *Ohio National Life Assurance Corp. v. Davis*, an insurer asked the Seventh Circuit to reverse the District Court's return of premiums on a STOLI policy to Egbert, the investor, arguing that "Egbert knew or should have known that he had bought an interest in a void contract."[180] In affirming the return of the premiums to Egbert, the court noted,

> Generally when an illegal contract is voided, the parties "will be left where they have placed themselves with no recovery of the money paid for illegal services." But there is an exception for the case in which the party that made the payments is not to blame for the illegality. There is no evidence that Egbert knew the policy was void . . . . Egbert paid substantial premiums and got nothing in return. He caused no harm, as he was not involved in the conspiracy. The company would be unjustly enriched if allowed to keep his $91,000.[181]

---

[177] *Id.* (emphasis added).
[178] *Id.*
[179] *Id.*
[180] 803 F.3d 904, 911 (7th Cir. 2015).
[181] *Id.* at 911-912 (quoting *Gamboa v. Alvarado*, 941 N.E.2d 1012, 1017 (2011)).

In other words, the court took a fault-based approach and determined that Egbert was entitled to a return of the premiums he paid on the STOLI policy because he did not know the policy was void and was not involved in the conspiracy.

Similarly, in *Carton v. B & B Equities Group, LLC*, the investors of an illegal void *ab initio* STOLI policy, the Cartons, sought the return of premiums, arguing that the insurers were unjustly enriched because they retained premiums without providing any coverage on the void policies.[182] The District Court of Nevada analyzed the fault of each party:

> The Insurers were the clear victims of the STOLI scheme. Although the Policies were void as against public policy, the Insurers are not alleged to have had any knowledge of the scheme or that the Policies were void ab initio. Consequently, the Insurers bore the risk that the scheme would not be uncovered and that they would unknowingly pay the death benefits to the Insured even though the Policies never actually came into existence. In contrast, the Cartons were at least on inquiry notice of the illicit scheme . . . . The transaction described to the Cartons was a textbook STOLI arrangement, which should have alerted the Cartons to the illicit nature of the "investment." Several other red flags also should have placed the Cartons on inquiry notice, including the fact they were guaranteed a 20% return on their investment during a recession, the complicated manner in which the arrangement was structured (which was unnecessary for a simple loan transaction), and the fact they received the Policy applications which all implied that the Insured were paying the premiums. Although the Cartons may have ultimately been duped into entering the arrangement, the facts clearly indicate they were at least put on notice that something in the transaction was amiss.[183]

---

[182] 827 F. Supp. 2d 1235, 1245 (D. Nev. 2011).
[183] *Id.* at 1247.

Because the court found that the Cartons were at fault and the insurance company was faultless, the court concluded that the Cartons were not entitled to the return of the premiums.[184]

Likewise, in *Sun Life Assurance Co. of Canada v. U.S. Bank National Ass'n* ("Sol"), the District Court of Delaware applied a fault-based analysis in determining whether to return the premiums to the investor. Here, the District Court surveyed the actions of all parties, finding that everyone was at fault to some extent.[185] For example, the court noted that the insurance company's hands "are not spotless:"

> Sun Life's hands, like U.S. Bank's and FCI's, are not spotless. Sun Life may have been unaware at origination that some of its policies constituted illegal human life wagers, but Sun Life admits (as the facts compel it to) that it subsequently developed a list of suspected STOLI policies. With the release of *Price Dawe*, Sun Life also knew (or should have known) that it could invalidate STOLI policies even after the two-year incontestability period. Yet, rather than notify policyholders that their policies were suspected STOLI, or that the validity of their policies may be challenged at any time, Sun Life "made the strategic decision not to pursue investigating [these] policies", and continued to collect (often enormous) premiums. Sun Life knowingly assumed the risk that someday a court would order it to repay some or all of the millions of dollars it collected in such premiums. If the Court were, instead, to leave the parties as it found them, Sun Life would be unjustly enriched.[186]

The District Court then noted that the investor was also at fault:

---

[184] *Id.*
[185] 2019 WL 8353393, at *4 (D. Del. Dec. 30, 2019).
[186] *Id.*

> FCI does not come to Court with untarnished hands either. FCI is not an ignorant or duped party, but a highly-sophisticated secondary market investor with nearly $9 billion in life insurance portfolio investments. It knew the Sol Policy was premium financed, that Coventry was involved in the policy origination, and that the policy portfolio it was acquiring was higher risk due to "overzealous origination methods" that were subject to legal challenges. . . . The Court is convinced that FCI knew or should have known at the time it purchased the Sol Policy there was a substantial risk the Policy was an illegal STOLI policy.[187]

After assessing fault, the court found that "[t]he only equitable remedy justified here is restitution damages, in which all premiums paid to Sun Life on the Sol Policy . . . are returned to U.S. Bank and/or FCI" because, "[i]n the Court's view, no party here has shown itself to be an innocent victim, and none should leave the Court an undisputed victor.

Although not explicitly arising in the STOLI context, the Tennessee Court of Appeals,[188] the Supreme Court of Minnesota,[189] the Supreme Court of Indiana,[190] the

---

[187] *Id.*

[188] *Branson v. Nat. Life & Acc. Ins. Co.*, 4 Tenn. App. 576, 580 (1927) ("There are many cases like this where it is held that a party who had in good faith paid premiums on a void policy could recover the premiums. If the policy is void as against public policy and the agent knew it but the one who secured the contract did not, the knowledge of the agent being the knowledge of the company, the company has received money on a contract known to be void—has received something for nothing, and should not be allowed to retain the premiums paid for which there has been no consideration.").

[189] *In re Millers' & Mfrs. Ins. Co.*, 97 Minn. 98, 118, 106 N.W. 485, 494 (1906) ("If the policy is illegal the premiums cannot be recovered . . . unless the parties are not 'in pari delicto.'").

[190] *Am. Mut. Life Ins. Co. v. Bertram*, 163 Ind. 51, 70 N.E. 258, 262 (1904) ("If the contract of insurance be illegal in its inception, the insured cannot recover the premiums paid, if the parties are in pari delicto. The controlling inquiry, then, in the present case, is, were the parties to the transaction equally in fault?").

Southern District of Florida,[191] and the Eighth Circuit[192] also have all decided whether to

return premiums by adopting a fault-based analysis grounded in considerations specific to

insurance policies declared void or illegal.

In all of these cases, the court analyzed the fault of the parties in order to determine

who was entitled to the premiums paid on an illegal insurance policy. These courts

considered the following questions: whether the facts surrounding the investment put the

investor on notice that something was amiss; whether the party failed to notice red flags;

whether the party knew the policy was void; whether the insurer later learned that the policy

was or might have been void; whether the investor's expertise in life insurance portfolio

investments should have caused it to know or suspect that there was a substantial risk that

---

[191] *Neiman v. Provident Life & Accident Ins. Co.*, 217 F. Supp. 2d 1281, 1288-89 (S.D. Fla. Aug. 26, 2002) ("Having found the insurance contract void as a matter of public policy, the Court must decide whether there are any additional remedies to impose. Courts will generally leave parties that are in pari delicto where they place themselves when ruling a contract unenforceable as a matter of public policy. A plaintiff may recover on an illegal contract only if he has not been guilty of wrongdoing or is not in pari delicto. The in pari delicto doctrine therefore precludes this Court from awarding Neiman the premiums he paid on the void contract, much less the disability benefits. As repeatedly mentioned, Neiman's own wrongdoing caused the contract to be void. Accordingly, Neiman was in pari delicto, if not more at fault than the insurance company, in causing the contract to be void and will recover neither benefits nor the premiums he paid. The Court must leave the parties where it found them.").

[192] *Wal-Mart Stores, Inc. v. Crist*, 855 F.2d 1326, 1335-35 (8th Cir. Aug. 26, 1988) ("'The general rule with respect to illegal contracts is that neither courts of law nor of equity will interpose to grant relief to the parties, if they have been equally cognizant of the illegality.' The level of culpability of the parties was best put, we think, by the district court when it said, 'there is more than enough fault to go around in this case.' Accordingly, we find that the district court should have found the parties in pari delicto and refused to grant relief of any sort.").

the policy it purchased was void; and whether the party was to blame for the illegality of the policy.

Thus, if the downstream investor was equally at fault with, or more at fault than, the insurer, the court left the parties where it found them, allowing the insurer to keep the premiums. If the downstream investor was innocent or the insurer was more at fault, the courts returned the premiums.

### ii. The Restatement (Second) of Contracts

"[I]t is against the public policy of [most states] to permit its courts to enforce an illegal contract prohibited by law. Ordinarily, we think, when such is the fact, neither party has a remedy to any extent against the other."[193] This general rule—that courts will not enforce an illegal contract—is reflected in the Restatement at Section 197: "Except as stated in §§ 198 and 199, a party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy unless denial of restitution would cause disproportionate forfeiture."[194] As clarified by the comment to Section 197:

---

[193] *Della*, 210 A.2d 847 at 849. *See also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42, 108 S. Ct. 364, 373, 98 L. Ed. 2d 286 (1987); *Neiman v. Provident Life & Accident Ins. Co.*, 217 F. Supp. 2d 1281, 1288-89 (S.D. Fla. Aug. 26, 2002); *Wal-Mart Stores, Inc. v. Crist*, 855 F.2d 1326, 1335-35 (8th Cir. Aug. 26, 1988); *Corbin v. Houlehan*, 100 Me. 246, 61 A. 131, 133 (1905); *Lewis v. Davis*, 145 Tex. 468, 477, 199 S.W.2d 146, 151 (1947); *Morrison v. Marsh & McLennan Cos., Inc.*, 439 F.3d 295, 300 (6th Cir. 2006); *City of De Kalb v. Int'l Ass'n of Fire Fighters, Loc. 1236*, 182 Ill. App. 3d 367, 372 (1989); *Zickler v. Shultz*, 603 So. 2d 916, 922 (Ala. 1992).
[194] Restatement (Second) of Contracts § 197 (Am. L. Inst. 1981).

In general, if a court will not, on grounds of public policy, aid a promisee by enforcing the promise, it will not aid him by granting him restitution for performance that he has rendered in return for the unenforceable promise. Neither will it aid the promisor by allowing a claim in restitution for performance that he has rendered under the unenforceable promise. It will simply leave both parties as it finds them, even though this may result in one of them retaining a benefit that he has received as a result of the transaction.[195]

Thus, the Restatement reflects that courts typically will not allow any party to obtain any remedy, including restitution. Yet, the Restatement identifies three exceptions to this common law rule in Section 197, Section 198, and Section 199.[196]

The text of Section 197 sets out a disproportionate forfeiture exception in which a party is entitled to restitution if the "denial of restitution would cause disproportionate forfeiture."[197] "[A]s elsewhere in this Restatement, the term 'forfeiture' is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange."[198]

In determining whether the denial of restitution would cause disproportionate forfeiture, comment b to Section 197 articulates a balancing test that directs the court to weigh the cost of the forfeiture against the gravity of the public policy involved: "Whether

---

[195] *Id.*

[196] *Id.*

[197] *Id.*

[198] Restatement (Second) of Contracts § 197 cmt. b.

the forfeiture is 'disproportionate' for the purposes of this Section will depend on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention."[199] Specifically, the court should consider "the party's deliberate involvement in any misconduct, the gravity of that misconduct, and the strength of the public policy."[200] However, if the "claimant has threatened grave social harm, no forfeiture will be disproportionate."[201] Instead, this exception is most "appropriate in the case of technical rules or regulations that are drawn so that their strict application would result in such forfeiture if restitution were not allowed."[202] Thus, whether a forfeiture is disproportionate depends both on the actions of the claimant, as well as the nature of the public policy involved.

The next exceptions articulated by the Restatement are found in Section 198. Section 198 states that

> A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if (a) he was excusably ignorant of the facts or of legislation of a minor character, in the absence of which the promise would be enforceable, or (b) he was not equally in the wrong with the promisor.[203]

---

[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] Restatement (Second) of Contracts § 198 (Am. L. Inst. 1981).

Consequently, Section 198 lays out two exceptions to the general rule—when a party is (1) excusably ignorant and (2) not equally in the wrong with the party from whom he seeks restitution.

Under the first exception, a party may obtain restitution if it is excusably ignorant of the facts leading to the unenforceability of the promise.[204] Comment a to Section 198 points the court to Section 180 of the Restatement for further clarification. The comments to Section 180, which discuss the effect of excusable ignorance, note that "good faith is expected on the part of the party who claims ignorance and he cannot blind his eyes because he does not wish to see."[205] In other words, a party is not excusably ignorant if it is willfully blind to the relevant facts.

Notably, this exception is enveloped by many of the questions asked by the court in the *in pari delicto* approach noted above. Specifically, the following questions from those cases appear to have the goal of determining whether a party was excusably ignorant of the relevant facts: whether the facts surrounding the policy put or should have put the investor on notice that something was amiss; whether the party failed to notice red flags; and whether the investor's expertise in life insurance portfolio investments should have caused it to know or suspect that there was a substantial risk that the policy it purchased was void. Thus, both Section 198(a) and the factors from the *in pari delicto* test articulated above seek to discover

---

[204] *Id.*
[205] Restatement (Second) of Contracts § 180 (Am L. Inst. 1981).

whether the party was excusably ignorant of the facts suggesting that the promise is unenforceable.

If both parties are excusably ignorant, however, restitution under Section 198(a) is unavailable, but restitution may still be available to the claimant under Section 198(b). Under Section 198(b), "[t]he general rule that neither party is entitled to restitution is [also] subject to an exception in favor of a party who is not equally in the wrong, or as it is sometimes said is not *in pari delicto*, with the party from whom he seeks restitution."[206] In other words, the Restatement directs the court to undertake an *in pari delicto* analysis that is substantively identical to those analyses performed in the *in pari delicto* cases surveyed in Section III.A.b.i.

Comment b to Section 198 identifies two common scenarios in which this exception arises.[207] In the first instance, the claimant is regarded as being less in the wrong because the public policy is intended to protect persons of the class to which he belongs and, as a member of that protected class, he is regarded as less culpable."[208] And, "[i]n the second type of case, the claimant is regarded as being less in the wrong because he has been the victim of misrepresentation or oppression practiced on him by the other party."[209]

---

[206] Restatement (Second) of Contracts § 198 cmt. b.
[207] Comment b identifies two common scenarios in which, "for the most part," Section 198(b)'s exception arises. Given that these scenarios only arise "for the most part," comment b does not identify every scenario in which a party is not equally in the wrong.
[208] Restatement (Second) of Contracts § 198 cmt. b.
[209] *Id.*

Outside these two common scenarios, the comment instructs courts to undertake an *in pari delicto* analysis to determine whether the parties are equally in the wrong. The remainder of comment b directs the court to consider the reprehensibility of the party's conduct, whether a party engages in improper transactions as a business, and the seriousness of the party's conduct when viewed in light of the social harm. Moreover, the comment notes that a party can be deprived of their gain if "he has enticed the claimant into the transaction, where he has devised a scheme to defraud the claimant, or where he engages in the misconduct professionally."[210] In other words, comment b allows for consideration of questions that are applicable to the context of policies void *ab initio* for lack of an insurable interest in order to determine a party's fault because it instructs the court to consider a number of factors bearing on the fault of the parties. As noted above, all the cases from Section III.A.b.i undertake an *in pari delicto* analysis or other fault-based analysis to determine the fault of the parties. Those analyses include questions such as whether the party procured the void policy, whether the party concealed the void nature of the policy, and whether the party knew or later learned that the policy was void. These same questions are applicable to an *in pari delicto* analysis under Section 198(b).

Section 198 encompasses all the questions considered by the courts in the *in pari delicto* cases from Section III.A.b.i. As noted above, those questions all fall within the scope of determining whether a party is excusably ignorant or not equally at fault. Although the

---

[210] *Id.*

43

cases that undertake a fault-based analysis do not cite to the Restatement, it appears to us that there is no real difference between the *in pari delicto* cases from Section III.A.b.i, and the Restatement. The Restatement simply provides a framework through which courts can undertake a fault-based analysis.

A party may be entitled to restitution under the final exception, which appears in Section 199, when that party did not engage in serious misconduct and "(a) he withdraws from the transaction before the improper purpose has been achieved, or (b) allowance of the claim would put an end to a continuing situation that is contrary to the public interest."[211] Comment a to Section 199 provides that to come within Section 199(a), "a party must actually withdraw by refusing any further participation in or benefits from the transaction. It is not enough that the achievement of the purpose has been prevented by circumstances beyond his control."[212] Whether "an improper purpose has been so substantially achieved that withdrawal should no longer give a right to restitution depends on the gravity of the social harm threatened under the facts of the particular case."[213] But "[t]he exception is not available in favor of a party whose misconduct is serious when viewed in the light of the threatened social harm."[214] Section 199(b) applies "when the denial of restitution would leave property in the hands of one whose control of it would be contrary to the public interest,

---

[211] Restatement (Second) of Contracts § 199 (Am. L. Inst. 1981).
[212] Restatement (Second) of Contracts § 199 cmt. a.
[213] *Id.*
[214] *Id.*

for example, because its status would be rendered so uncertain as seriously to restrain its alienation."[215]

The Restatement has been cited by two courts in four cases, one of which is this appeal. In those cases, the investors asked the court to return premiums paid on insurance policies that were void *ab initio* as against public policy for lack of an insurable interest. Those courts identified the Restatement as providing the appropriate framework to analyze the issues presented.[216]

**B.    The Delaware Supreme Court Adopts a Fault-Based Analysis, Framed Under the Restatement, to Determine Whether Premiums Should Be Returned for a Policy Void for Lack of an Insurable Interest**

After surveying the applicable case law, this Court adopts a fault-based analysis, framed under the Restatement, that considers questions specific to insurance policies declared void *ab initio* as against public policy for lack of an insurable interest as the correct test to determine whether premiums should be returned. We adopt this approach for two reasons.

First, a fault-based analysis as framed under the Restatement would place this Court in line with the majority of jurisdictions that have confronted this issue. As surveyed above,

---

[215] Restatement (Second) of Contracts § 199 cmt. b.
[216] *See Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 2021 WL 1820573, at *1 (D. Del. May 6, 2021), *adopted by* 2021 WL 3886370 (D. Del. Aug. 31, 201); *Columbus Life Ins. Co. v. Wells Fargo Bank*, 2021 WL 106919, at *1 (D. Del. Jan. 12, 2021); *Sun Life Assurance Co. of Canada v. Wilmington Tr., Nat'l Ass'n*, 2022 WL 179008, at *1 (Del. Super. Ct. Jan. 12, 2022).

most courts have adopted a fault-based approach to this question as opposed to a general rule that the premiums must be returned to the investor.[217]

Second, and more important, applying a nuanced fault-based test, instead of rescission, is more consistent with public policy considerations. Because insurance policies that are void as against public policy for lack of an insurable interest are frauds on the court that are unenforceable, the Court should take care to discourage these policies from coming into existence. The automatic return of premiums certainly discourages insurance companies from hiding the invalidity of a policy for as long as possible in order to continue collecting premiums. But the automatic return of premiums encourages investors to continue purchasing life insurance policies without investigation into whether those policies are unenforceable policies due to lack of an insurable interest. After all, under the best-case scenario, the investor gets paid the death benefits. Under the worst-case scenario, the investor receives the return of the premiums—other than the time value of money, the investor loses nothing in the gamble. This is despite any role it may have played in procuring the void policy or ignoring the fraud. A fault-based analysis will encourage investors to actually investigate all policies to avoid the risk of losing their premiums—a thorough investigation of insurance policies will hopefully uncover those that are void *ab initio* as

---

[217] We note that the majority of the courts surveyed above determined that the premiums should be returned to the investor after undertaking a fault-based analysis.

against public policy. This approach should incentivize investors not to procure or purchase these unenforceable policies in the first instance.

A fault-based analysis also incentivizes insurers to speak up when the circumstances suggest that a policy is void for lack of an insurable interest because they will not be able to retain premiums if they stay silent after being put on inquiry notice, and they might also be responsible for interest payments. In other words, our test incentivizes each player along the chain of these insurance policies to behave in good faith.

Thus, when analyzing a viable legal theory that seeks as a remedy the return of premiums paid on insurance policies declared void *ab initio* for lack of an insurable interest, Delaware courts shall analyze the exceptions outlined in Sections 197, 198, and 199 of the Restatement and determine whether any of those exceptions permit the return of the premiums. A court would need to determine whether: (1) there would be a disproportionate forfeiture if the premiums are not returned; (2) the claimant is excusably ignorant; (3) the parties are not equally at fault; (4) the party seeking restitution did not engage in serious misconduct and withdrew before the invalid nature of the policy becomes effective; or (5) the party seeking restitution did not engage in serious misconduct, and restitution would put an end to the situation that is contrary to the public interest.

A court analyzing the exceptions outlined in Section 198 should consider the following questions: whether the party knew the policy was void at purchase or later learned the policy was void; whether the party had knowledge of facts tending to suggest that the

policy is void; whether the party procured the illegal policy; whether the party failed to notice red flags; and whether the investor's expertise in the industry should have caused him to know or suspect that there was a substantial risk that the policy it purchased was void.

Thus, the fault of the parties and public policy considerations will determine which party is entitled to the premiums paid on an insurance policy that is void *ab initio* for lack of an insurable interest.

### C. The Superior Court Failed to Consider Whether Either Party Had Inquiry Notice of the Void Nature of the Policy

Geronta argues that should the Court find that restitution is the correct remedy, the Superior Court failed to properly address comparative fault between the parties, instead finding that Geronta was not the victim of misrepresentation or oppression.[218] Geronta contends that the Superior Court failed to acknowledge "conclusive trial evidence (much of it stipulated) that Brighthouse had actual knowledge at some point between April 28, 2010 and October 21, 2011 that the Policy was the product of criminal fraud, and thus void for lack of insurable interest."[219] In other words, Geronta believes that, based on the facts, the court should have concluded that Brighthouse was at fault.[220]

---

[218] Opening Br. 25.

[219] *Id.* at 31.

[220] *Id.* at 33-39. The Appellants also allege that the Superior Court erroneously ignored Section 197's disproportionate forfeiture exception, erroneously applied Section 198(b), and ignored deleterious public policy consequences of its decision. *Id.* at 39-42. Given our ruling and remand, we do not address the Appellant's remaining arguments.

Brighthouse responds that the court properly concluded that Brighthouse was excusably ignorant because it (1) followed its sound guidelines and (2) did not have actual knowledge that the Policy lacked an insurable interest until Geronta told Brighthouse that Seck was fictitious in 2017.[221] Brighthouse contends that the Superior Court's conclusions are supported by the text of the press releases, which imply that Seck was a real person. Brighthouse further argues that Geronta conflates knowledge of criminal fraud with knowledge of lack of an insurable interest, which, according to Brighthouse, are two different things.[222]

In concluding that Geronta was not entitled to restitution under Section 198 of the Restatement, the Superior Court conducted a fault-based analysis that considered two questions articulated by this Court. For example, the court considered Geronta's expertise in the life insurance investor industry: "Geronta is a sophisticated company with knowledge and experience in the life insurance investor market. Indeed, Geronta's experience and assumption of risk were part of the P&S Agreement."[223] The court also considered whether Geronta failed to notice red flags:

- "Here, prior to purchase, Geronta, in consultation with Leadenhall, made the deliberate decision to superficially look at the Seck Policy by solely focusing on whether it was active."[224]

---

[221] Answering Br. 27-31.
[222] *Id.* at 29-30.
[223] *Id.* at 52; *see* A431-32.
[224] Ex. B at 52-53; B4.

49

- "Geronta purposefully ignored the possibility that some of the unexamined policies in the bulk purchase might have been unenforceable."[225]
- "Geronta's due diligence as to the Seck Policy was extremely limited."[226]

The Superior Court also concluded that Brighthouse was not at fault because Geronta failed to show that Brighthouse had *actual knowledge* of the void nature of the Policy. In other words, the Court found that Brighthouse did not have *actual knowledge* of the Policy's illegality:

- "Pape Seck did not broker the Seck Policy application (it was brokered by Talma Nassim at Algren). Also, Pape Seck was not the beneficiary of the Seck Policy (the Seck Trust was the beneficiary). MetLife's denial of Pape Seck's broker application (and the three policy applications) were unrelated to the Seck Policy . . . ."[227]
- "While the evidence demonstrates that Brighthouse knew that Pape Seck committed fraud in obtaining the Seck Policy, the facts do not show that Brighthouse knew that the Seck Policy lacked an insurable interest, that it would never pay benefits to the policyholder, that Brighthouse had anything to gain by Geronta paying premiums instead of EEA, or that it intended to mislead Geronta into purchasing a policy that Brighthouse knew was void *ab initio*."[228]

In our view, Section 198 and the *in pari delicto* cases from Section III.A.b.i focus on whether a party had either actual knowledge or *inquiry notice* of the invalidity of the policy. The focus on inquiry notice is why those cases ask whether the party had knowledge of facts tending to suggest the void nature of the policy. Here, the Court failed to consider that

---

[225] Ex. B at 53; B1, 4-5.
[226] Ex. B at 53; B1-5.
[227] Ex. B at 60.
[228] *Id.* at 61.

question.  As explained above, the court should have also considered whether Brighthouse

was on *inquiry notice* of the void nature of the Policy.

We believe the following stipulated facts or factual findings by the court could support

a finding that Brighthouse was on inquiry notice of facts tending to suggest that the Policy

was void:

- "On December 17, 2009, David Bishop [, a Brighthouse internal investigator,] sent an email to Jean Philipp stating: 'Just received two wire transfers to review that have strong IOLI flags.'  One of the wire transfers related to the Policy, noting that 'Ownership changed 7/09 to EEA Life Settlements, Inc. (just after the incontestability period expired)' and that the writing agent was Talma Nassim, through Algren Brokerage."[229]
- On April 26, 2010, New Jersey's Office of the Insurance Fraud Prosecutor subpoenaed MetLife's records concerning Seck and, in response, MetLife produced 169 pages of documents.[230]
- On October 17, 2011, the New Jersey Attorney General released a third press release about Pape Seck, stating that Pape Seck pleaded guilty to one count of insurance fraud and two counts of theft by deception.[231] It also announced that Pape Seck admitted that he knowingly made fraudulent or misleading statements between November 12, 2006, and June 4, 2008, in support of seven life insurance policy applications, one of which was the Policy.[232]  The press release thanked MetLife "for [its] assistance in the investigation."[233]
- On October 26, 2011, Jim McCarthy, an investigator with MetLife's Claims Investigation Unit emailed MetLife's Field Investigation Unit for Corporate Ethics and Compliance to make them aware of Pape Seck's conviction . . . .[234] The email's subject line contained the name Mansour Seck, the Policy's policy number, Pape Seck's name, and the

---

[229] A571.

[230] A575; Ex. B at 26.

[231] A580.

[232] *Id.*

[233] *Id.*

[234] A3034.

MetLife broker number.[235] The email noted that Pape Seck was recently sentenced for insurance fraud involving Seck and stated that MetLife cooperated with the authorities.[236]

However, we recognize that the Court made factual findings that may be viewed as inconsistent with this conclusion. Given this Court's deferential standard of review for the trial court's factual findings, the Superior Court should be given an opportunity to review its factual findings through the lens of our newly articulated fault-based test.

As such, we remand for the Superior Court to reconsider its factual findings in light of this Court's articulated test and specifically direct the court to consider whether either party had inquiry notice of the void nature of the Policy.

## D.    The Superior Court Did Not Err by Excluding Testimony

Geronta contends that the Superior Court erred by precluding Geronta's witnesses from testifying about their understanding of customary due diligence in the tertiary market.[237] Specifically, Geronta argues that the Superior Court abused its discretion when it concluded that witness testimony on the topic of industry standards requires an expert opinion.[238] That ruling, Geronta contends, contravenes Rule of Evidence 701 because Rule of Evidence 701(a) permits lay opinion testimony based on personal knowledge and the witnesses' testimony was permissible fact testimony.[239] Geronta argues that the Superior

---

[235] *Id.*
[236] *Id.*
[237] Opening Br. 43-45.
[238] *Id.* at 43.
[239] *Id.* at 44.

Court's ruling prejudiced Geronta at trial because "the Trial Court barred [Geronta] from testifying for the industry reasons that Geronta it [sic] conducted its diligence, but then ruled that diligence was fault-worthy without ever hearing the reasons for it."[240]

"The limitation a trial judge puts on the examination of a witness is an evidentiary ruling which we generally review for abuse of discretion."[241] During the pre-trial conference, the Superior Court ruled on Brighthouse's motion in limine, in which Brighthouse sought to preclude evidence from Geronta's witnesses about their investment experience and the standards of the tertiary market regarding due diligence.[242] Brighthouse argued that Geronta's testimony should be precluded because Geronta refused to answer questions about that topic at deposition.[243] On that basis, the Superior Court ruled that Geronta would not be able to talk about industry standards:

> Brighthouse: We asked him what -- is there some standard policy that you use. Instruction not to answer. Now, as Your Honor is exactly right, they're going to take his hat off at the trial, so they say, and have him testify to his own personal, not the Royal Bank of Scotland, his personal deep experience. That was the kind deep experience we were trying to get to and we weren't allowed to.
> The Court: I agree with you on this.[244]

---

[240] *Id.* at 45.
[241] *Jones v. State*, 940 A.2d 1, 15 (Del. 2007).
[242] A919.
[243] A919-21.
[244] A927.

In other words, the court also ruled that Geronta's evidence was precluded because of the refusal to testify to this same topic at deposition, not only because the testimony would require expert testimony. We cannot conclude that the Superior Court erred in excluding the evidence on this basis. Because Geronta refused to allow its witness to testify about industry standards during discovery, it was not an abuse of discretion for the Superior Court to preclude it from testifying about industry standards at trial.

As such, we affirm the Superior Court's ruling on this issue.

## IV.    CONCLUSION

For the foregoing reasons, the Court AFFIRMS in part and REVERSES and REMANDS in part the Superior Court's judgment.